# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEADERSHIP STUDIES, INC., dba CENTER FOR LEADERSHIP STUDIES, a California corporation,<br><br>Plaintiff/Counterclaim-Defendant,<br>v.<br>BLANCHARD TRAINING AND DEVELOPMENT, INC., a California corporation, and Does 1-10, inclusive,<br><br>Defendant/Counterclaim-Plaintiff. | CASE NO. 15cv1831-WQH-KSC<br><br>ORDER |

HAYES, Judge:

The matter before the Court is the Motion to Dismiss the Counterclaim and Strike the Third Affirmative Defense filed by Plaintiff and Counterclaim-Defendant Leadership Studies, Inc. ("Leadership"). (ECF No. 54).

**I. Background**

On August 17, 2015, Leadership commenced this action by filing a complaint against Defendant/Counterclaim-Plaintiff Blanchard Training and Development, Inc. ("Blanchard"). (ECF No. 1). On November 9, 2015, Leadership filed a first amended complaint. (ECF No. 10). On April 13, 2016, Leadership filed a second amended complaint. (ECF No. 27). On November 7, 2016, Leadership filed the Third Amended Complaint (ECF No. 49) ("TAC"), which is the operative complaint in this matter. On

November 23, 2016, Blanchard filed an Answer to the Third Amended Complaint, Affirmative Defenses, and Counterclaim for Cancellation of Trademark. (ECF No. 52).

On December 19, 2016, Leadership filed the Motion to Dismiss the Counterclaim for Cancellation of Trademark and Strike the Third Affirmative Defense of Estoppel by Naked Licensing. (ECF No. 54). On January 9, 2017, Blanchard filed a response in opposition. (ECF No. 55). On January 13, 2017, Leadership filed a reply. (ECF No. 56).

**II. Allegations of the Third Amended Complaint (ECF No. 49)**

Leadership "is a corporation organized and existing under the laws of the State of California and doing business and having offices in Cary, North Carolina. Leadership Studies is engaged in the business of teaching and promoting the 'Situational Leadership Model,' which enables managers, salespeople, peer leaders, teachers, and parents to interface with and influence others more effectively." *Id.* at 2. Blanchard "is a corporation organized and existing under the laws of California and doing business and having offices in Escondido, California. Blanchard is engaged in the business of leadership training, which includes development and implementation of leadership training models for businesses that wish to increase productivity and efficiency among their workforces." *Id.*

"The founder of Leadership Studies, Paul Hersey, developed a theory concerning a methodology for leaders to influence others based on their readiness for a particular task. He named the model 'Situational Leadership.'" *Id.* at 3. "Ken Blanchard worked with Dr. Hersey as Dr. Hersey developed his theory. Dr. Blanchard became a partner in Dr. Hersey's company, Center for Leadership Studies." *Id.* at 3-4.

"In 1980 Dr. Blanchard sold his interest in Center for Leadership Studies and he was paid thirty thousand dollars ($30,000.00) incrementally through 1981 for his interest in the company." *Id.* at 4. "In conjunction with the sale of his interest in Center for Leadership Studies, Dr. Blanchard released any and all rights he had in any materials copyrighted by Center for Leadership Studies including those in which he had

any role in preparing." *Id.* "In 1982, Blanchard also assigned to Center for Leadership Studies its interest in then-pending a trademark application before the United States Patent and Trademark Office for the mark 'Situational Leadership,' including 'all right, title and interest in and to said mark, together with the good will of the business symbolized by the mark,' bearing serial number 73283537." *Id.* "When Dr. Blanchard decided he wanted to branch out on his own and provide management training through his company, Blanchard, [Dr. Blanchard] wanted to use the concepts that he had worked on with Dr. Hersey[.]" *Id.* "Dr. Hersey agreed to license the right to use the mark 'SITUATIONAL LEADERSHIP' with the understanding that Dr. Blanchard's use of the Mark would inure to the benefit of Dr. Hersey's company, Leadership Studies." *Id.*

"Accordingly, Leadership Studies and Blanchard entered into a license agreement (the 'License Agreement') on or about December 19, 1987, pursuant to which Leadership Studies licensed to Blanchard the right to use Leadership Studies' trademark 'SITUATIONAL LEADERSHIP' under the condition that '(1) BLANCHARD shall utilize the mark "SITUATIONAL LEADERSHIP" only in association with goods and services which meet or exceed a level of quality exemplified by the goods and services presently offered under the mark "SITUATIONAL LEADERSHIP" . . . .'" *Id.* "In the License Agreement, Blanchard acknowledges Leadership Studies' ownership of the 'Situational Leadership®' trademark (the 'Mark'). Blanchard further agrees to the additional condition that 'In utilizing the mark "SITUATIONAL LEADERSHIP", BLANCHARD shall at all times use the appropriate statutory notice symbol in conjunction therewith[.]'" *Id.* at 5. "The License Agreement also requires that 'BLANCHARD shall inform LEADERSHIP STUDIES of any infringement of the [Mark].'" *Id.* "The License Agreement also requires that 'BLANCHARD shall inform LEADERSHIP STUDIES of any infringement of the [Mark].' The License Agreement does not grant Blanchard rights to assign or sublicense the Mark, other than in conjunction with the sale of Blanchard's entire business, in which case Blanchard is

- 3 - 15cv1831-WQH-KSC

required to offer Leadership Studies a right of first refusal." *Id.*

"The Mark 'Situational Leadership®' is the subject of a valid trademark registration by Leadership Studies with the U.S. Patent and Trademark Office (Registration No. 3,407,887) for educational kits[.]" *Id.* "The Mark 'Situational Leadership®' also is the subject of a valid trademark registration by Leadership Studies with the U.S. Patent and Trademark Office (Registration No. 4,222,028) for audio and video recordings featuring educational material[.]" *Id.* at 5-6. "Leadership Studies learned that Blanchard, in violation of the parties' respective rights and duties under the Licensing Agreement, has commenced a pattern and practice of registering the marks 'Situational Leadership' and 'Situational Leadership II' in other countries." *Id.* at 7.

"The derivative junior marks 'Situational Leadership II' and 'SLII' are confusingly similar to Leadership Studies' registered senior mark, 'Situational Leadership®.'" *Id.* at 9. "Blanchard's use of the derivative junior marks 'Situational Leadership II' and 'SLII' are likely to cause, and cause, consumer confusion, thereby infringing upon the Leadership Studies' rights to its mark, 'Situational Leadership.' In fact, Blanchard markets 'Situational Leadership II' ('SLII') as another version of 'Situational Leadership,' which confirms that it seeks to benefit from the goodwill and secondary meaning associated with the mark, 'Situational Leadership®,' but now seeks to attribute the goodwill of both the senior and junior marks to Blanchard instead of Leadership Studies." *Id.* "Blanchard increasingly provides information to prospective clients and on its website that emphasizes the 'vast' differences between Situational Leadership and 'Situational Leadership II'/'SLII', and now disparages both the foundation and content of Situational Leadership®, all to the detriment of the Situational Leadership® Mark." *Id.*

"On September 25, 2015, subsequent to the filing of the original complaint in the instant action, and in response to the instant action, Blanchard filed a separate lawsuit against Leadership Studies . . . (the 'Blanchard Lawsuit') that asserted claims that are affirmative defenses to the instant action." *Id.* at 10. "The Blanchard Lawsuit alleged

that Leadership Studies is precluded from asserting claims against Blanchard related to Leadership Studies' Mark because, inter alia, Leadership Studies allegedly did not adequately police Blanchard's use of the Mark and that the License Agreement that has governed Blanchard's use of the Mark since 1987 is a naked license." *Id.* "The Blanchard Lawsuit asserted positions concerning the ownership of the Mark, and the validity of the License Agreement, that are contrary to the express terms of the License Agreement and the parties' course of conduct pursuant to the License Agreement." *Id.* at 10-11.

"On September 30, 2015 Leadership Studies sent a letter to Blanchard terminating the License Agreement on the grounds that Blanchard had materially breached its terms and conditions." *Id.* at 11. "Despite the termination of the License Agreement, Blanchard continues to use the Mark, more often than not without attribution." *Id.*

In the Third Amended Complaint, Leadership alleges nine causes of action: (1) breach of written contract; (2) breach of the covenant of good faith and fair dealing; (3) trademark infringement under the Lanham Act, § 43(A) and 15 U.S.C. § 1125; (4) trademark infringement via reverse confusion under the Lanham Act, § 43(A) and 15 U.S.C. § 1125; (5) fraud in obtaining registered marks under 15 U.S.C. §§ 1064(3) & 1119; (6) unfair competition; (7) copyright infringement; (8) accounting; and (9) declaratory relief. (ECF No. 49).

**III. Allegations of the Counterclaim (ECF No. 52 at 42-53)**

In its Answer to the Third Amended Complaint, Blanchard contends that "Ken Blanchard and Paul Hersey first met in 1966 at Ohio University. . . . Ken Blanchard agreed to join Paul Hersey as a co-author of the book that would become Management of Organizational Behavior." (ECF No. 52 at 43-44). "In 1978, Ken Blanchard founded Blanchard Training to continue and expand his work with Situational Leadership and the further development of the Situational Leadership Theory." *Id.* at 45. "From 1979 to 1981, Blanchard Training and Leadership Studies collaborated as

partners, though their partnership agreement expressly permitted the partners to "participate in other business ventures of every kind whether or not those other business ventures compete with the partnership" without sharing income or profit derived from any such other business venture." *Id.*

"In 1981, as Blanchard Training continued to grow and Ken Blanchard continued to teach and lecture on Situational Leadership, Blanchard Training and Leadership Studies began to follow separate paths, and Blanchard Training left the partnership consisting of Blanchard Training, Leadership Studies, and Keilty, Incorporated." *Id.* "Blanchard Training's success in the following years was fueled by the work that Ken Blanchard and his associates at Blanchard Training were doing to create a new version of the original Situational Leadership Theory, model, and application that they referred to as 'Situational Leadership II' and/or 'SLII.'" *Id.* at 46. "By the early 1980s, the success of Ken Blanchard and Blanchard Training began to impact the competitive but friendly relationship between Blanchard Training and Leadership Studies." *Id.*

"After several years of operating independently of each other, the companies negotiated an arrangement whereby each company would continue to use the SITUATIONAL LEADERSHIP mark independently of each other, in perpetuity, without any inspection rights, exercise of quality control, or payments of royalties." *Id.* at 47. "The arrangement was memorialized in an agreement executed on December 19, 1987 (the '1987 Agreement')." *Id.* "The 1987 Agreement nominally identified Leadership Studies as the owner of the SITUATIONAL LEADERSHIP trademark and Blanchard Training as the licensee, but in the execution version of the 1987 Agreement the parties deleted and removed the single quality control provision by crossing it out and initialing their deletions[.]" *Id.* "In a memorandum dated December 22, 1987, Ken Blanchard explained the 1987 Agreement to Blanchard Training's associates, stating that 'we have agreed…without inspection rights. For us the inspection rights was a deal killer. We didn't want Hersey looking over our shoulder.'" *Id.* at 48.

"The only surviving reference to 'quality' in the 1987 Agreement is a reference

to use of 'the mark "SITUATIONAL LEADERSHIP" only in association with goods and services that meet or exceed a level of quality exemplified by the goods and services presently offered under the mark "SITUATIONAL LEADERSHIP."' However, this reference to 'quality' provided Leadership Studies with no ability to control the level of quality on an ongoing basis, by virtue of inspections or otherwise." *Id.* "Blanchard Training was permitted under the 1987 Agreement to sublicense the SITUATIONAL LEADERSHIP mark, as the license extended 'to all materials and services produced by or under the direction of BLANCHARD and products sold or service delivered by persons/entities authorized by BLANCHARD.' Blanchard Training authorized other 'persons/entities' to sell such products and deliver such services." *Id.* "In failing to include a quality control provision, the 1987 Agreement lacked the most basic and essential provision of a trademark license." *Id.*

"In the decades following the execution of 1987 Agreement, Leadership Studies and Blanchard Training openly competed with each other and both companies were aware that the other company was independently producing materials to teach, deliver, and train its own version of Situational Leadership, which Blanchard Training sought to distinguish by use of the names 'Situational Leadership II' and/or 'SLII.'" *Id.* at 49. "Leadership Studies did not control or supervise Blanchard Training's use of the SITUATIONAL LEADERSHIP mark at any time after the execution of 1987 Agreement. . . . Leadership Studies has failed to prevent or control the widespread uncontrolled use of the SITUATIONAL LEADERSHIP mark by third parties." *Id.* at 50. "For example, a current Google search reveals numerous unauthorized third party uses of 'situational leadership,' in a generic manner to refer to a theory regarding leader training and development, as well as to identify related goods or services apparently not controlled by Leadership Studies." *Id.* Blanchard alleges a counterclaim for Cancellation of Trademark against Leadership pursuant to 15 U.S.C. § 1119.

**IV. Analysis**

**A. Motion to Dismiss the Counterclaim for Cancellation of Trademark**

### i. Contentions of the Parties

Leadership contends that the licensee estoppel doctrine bars Blanchard from challenging the validity of the trademark because of Blanchard's status as a licensee. Leadership asserts that it agreed to license the use of the "Situational Leadership" trademark to Blanchard in 1987. Leadership contends that the Court must assume, for the purpose of this Motion, that the 1987 Agreement was not terminated. (ECF No. 56 at 5). Leadership contends that "the licensee estoppel doctrine forbids a continuing licensee like Blanchard to challenge the validity of the 'SITUATIONAL LEADERSHIP®'" trademark. *Id.* at 5-6. Leadership contends, "Because the Counterclaim relies entirely on alleged facts and events during the term of the License, it should be dismissed without leave to amend." (ECF No. 54-1 at 20).

Blanchard contends that the licensee estoppel doctrine is not applied rigidly against all licensees to bar adverse claims by a licensee against its licensor. Blanchard contends that "it would be premature to apply the licensee estoppel doctrine on a motion to dismiss, as the parties dispute whether the 1987 Agreement has been terminated, and various courts have held that termination would make licensee estoppel not applicable[.]" (ECF No. 55 at 7). Blanchard asserts that Leadership has taken the position that the 1987 Agreement has been terminated, while Leadership also contends that the Agreement requires the Court to apply the licensee estoppel doctrine. Blanchard contends that, "While Leadership Studies is entitled to plead inconsistent theories in the alternative, the fact that Leadership Studies pleads a theory of liability that various courts have found inconsistent with licensee estoppel weighs against applying licensee estoppel at the pleading stage in this case." *Id.* at 20.

### ii. Applicable Law

A motion to dismiss a counterclaim brought pursuant to Federal Rule of Civil Procedure 12(b)(6) is analyzed under the same standard as a Rule 12(b)(6) motion to dismiss a plaintiff's complaint. *See Oracle Am., Inc. v. CedarCrestone, Inc.*, 938 F. Supp.2d 895, 900 (N.D. Cal. 2013). Federal Rule of Civil Procedure 12(b)(6) permits

1 dismissal of a claim for relief for "failure to state a claim upon which relief can be
2 granted[.]" Fed. R. Civ. P. 12(b)(6).

3 "A district court's dismissal for failure to state a claim under Federal Rule of
4 Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the
5 absence of sufficient facts alleged under a cognizable legal theory.'" *Conservation
6 Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica
7 Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). "To survive a motion to dismiss, a
8 plaintiff's complaint must have sufficient facts 'to state a facially plausible claim to
9 relief.'" *Id.* (quoting *Shroyer v. New Cindular Wireless Servs., Inc.*, 622 F.3d 1035,
10 1041 (9th Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual
11 content that allows the court to draw the reasonable inference that the defendant is liable
12 for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell
13 Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "In sum, for a complaint to survive
14 a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences
15 from that content, must be plausibly suggestive of a claim entitling the plaintiff to
16 relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft*,
17 556 U.S. at 678).

18 In *Pac. Supply Co-op v. Farmers Union Cent. Exch. Inc.*, 318 F.2d 894 (9th Cir.
19 1963), the Court of Appeals identified "the long settled principle of law that a
20 licensee . . . of a trademark or trade name may not set up any adverse claim in it as
21 against its licensor." *Id.* at 908. The Court of Appeals stated that "a recognized
22 licensee['s]" use of a trademark pursuant to a license agreement "sets up no rights in
23 that licensee adverse to the terms of the license and the actual circumstances of the use."
24 *Id.* at 908-09. This principle has been referred to by courts as the "licensee estoppel
25 doctrine." *See Robanda Intern., Inc. v. Parkinson*, No. 13cv490 BTM(BLM), 2013 WL
26 4039835, at *3 (S.D. Cal. Aug. 6, 2013) (Moskowitz, C.J.) (concluding that the doctrine
27 of licensee estoppel articulated by the Court of Appeals in *Pac. Supply* may apply to
28 prevent the plaintiff/licensee of a licensing agreement still in effect from challenging

the validity of the defendant/licensor's trademark); *Monster, Inc. v. Dolby Labs. Licensing Corp.*, 920 F. Supp.2d 1066, 1076-77 (N.D. Cal. 2013) ("The licensee estoppel doctrine precludes a licensee from challenging the validity of the licensor's trademark based upon conduct that occurred during the life of its license, particularly with respect to the licensee itself.") (citing *Pac. Supply*, 318 F.2d at 908); *Gold Club-SF, LLC v. Platinum SJ Enter.*, Case No. 13–cv–03797–WHO, 2013 WL 5273070, at *10 (N.D. Cal. Sept. 18, 2013) (stating that "the doctrine of licensee estoppel" may prevent the licensee from challenging the validity of a trademark).

However, courts have generally applied the doctrine to prevent adverse claims by a licensee against its licensor while the license agreement between the parties is in effect. *See Robanda*, 2013 WL 4039835, at *3 ("Because the license agreement is still in effect, Plaintiff may be barred by the doctrine of licensee estoppel from challenging the validity of Defendant's ownership or potential abandonment of the trademark until the license expires."); *Monster, Inc.*, 920 F. Supp.2d at 1077 (stating that the doctrine only applies to preclude a licensee's challenge to a licensor "based upon conduct that occurred during the life of [the licensor's] license").

### iii. Analysis

In the TAC, Leadership alleges that on September 30, 2015, it "sent a letter to Blanchard terminating the License Agreement on the grounds that Blanchard had materially breached its terms and conditions." (ECF No. 49 at 11). In its answer to the TAC, Blanchard

> admits that it received a letter dated September 30, 2015 from Leadership Studies purporting to terminate the perpetual, royalty-free 1987 Agreement. Blanchard Training denies that Leadership Studies had the right to terminate the 1987 Agreement, and Blanchard Training denies that the termination was effective.

(ECF No. 52 at 10). Blanchard contends that the Court should not apply the doctrine of licensee estoppel because the parties dispute whether the 1987 Agreement has been effectively terminated. (ECF No. 55 at 19-20). Leadership contends that "the Court must assume that the 1987 License Agreement was not terminated for purposes of this

1 | Motion." (ECF No. 56 at 5).

Once a court determines the existence of a license agreement, the licensee estoppel doctrine may apply to prevent a licensee from "set[ting] up any adverse claim in it as against its licensor." *Pac. Supply*, 318 F.2d at 908. The parties have identified cases in which the licensee estoppel doctrine has been applied to preclude a licensee from asserting an adverse claim against its licensor – both when the underlying license agreement remains valid during the pendency of the action, and when the underlying license agreement has been terminated *by the licensee* after the action has been filed. *Compare Robanda*, 2013 WL 4039835, at *3, *with Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053, 1058-60 (9th Cir. 1976) (applying doctrine to prevent licensee from asserting counterclaim that underlying license was invalid after the agreement had been purportedly repudiated *by the licensee* after the action had been filed) (emphasis added).

However, the Court does not conclude at the motion to dismiss phase that Leadership, as a licensor, may terminate the 1987 Agreement and subsequently rely upon the existence of the Agreement to estop its licensee Blanchard from asserting a counterclaim challenging the validity of the trademark. Further, in the event that Leadership prevails on its claim that the 1987 Agreement was terminated by the September 30, 2015 letter to Blanchard, estoppel may not apply to prevent Blanchard from challenging the validity of the trademark based upon conduct that took place while the Agreement was not in effect. The Court cannot conclude at this stage of the proceedings that the licensee estoppel doctrine applies as a matter of law to preclude Blanchard from challenging the validity of the trademark. Accordingly, Defendant's Motion to Dismiss the counterclaim is DENIED.

**B. Motion to Strike the Third Affirmative Defense of Estoppel by Naked Licensing**

    **i. Contentions of the Parties**

Leadership contends that the licensee estoppel doctrine bars the defense of naked

licensing "if it is based upon facts occurring during the license term." (ECF No. 54-1 at 26). Leadership contends that the third affirmative defense should be stricken because it "challenges [Leadership's] ability to enforce its trademark for the same reasons as those alleged in the Counterclaim." *Id.* at 27.

Blanchard contends that its third affirmative defense for estoppel by naked licensing differs from its counterclaim for cancellation of trademark. Blanchard asserts that the defense of naked licensing relies upon facts pertaining to estoppel of licensor Leadership, while its counterclaim pertains to licensee estoppel. Blanchard contends that "[t]he Third Affirmative Defense and Counterclaim seek entirely different forms of relief and are underpinned by a variety of facts, only some of which overlap." (ECF No. 55 at 24).

### ii. Applicable Law

Federal Rule of Civil Procedure 12(f) states that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The purpose of Rule 12(f) " is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial[.]" *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983). "Affirmative defenses are insufficient as a matter of law where there are no questions of fact, [ ] any questions of law are clear and not in dispute, and [ ] under no set of circumstances could the defense succeed." *Hernandez v. Cty. of Monterey*, 306 F.R.D. 279, 284-85 (N.D. Cal. 2015) (citations and quotation marks omitted).

### iii. Analysis

In its third affirmative defense for estoppel by naked licensing, Blanchard asserts that Leadership "is estopped from enforcing the terms of any trademark license conveyed to Blanchard Training in the 1987 Agreement." (ECF No. 52 at 37). Construing the facts in the light most favorable to the non-moving party Blanchard, the Court cannot conclude that Leadership is entitled to prevail on its claim that

Blanchard's naked licensing affirmative defense is inapplicable to this case as a matter of law. Therefore, the Court concludes that the Motion to Strike the third affirmative defense is DENIED.

**V. Conclusion**

IT IS HEREBY ORDERED that the Motion to Dismiss the Counterclaim and Strike the Third Affirmative Defense filed by Plaintiff and Counterclaim-Defendant Leadership (ECF No. 54) is DENIED.

DATED: August 2, 2017

**WILLIAM Q. HAYES**
United States District Judge