MICHELE M. DESOER (SBN 119667)
  *mdesoer@zuberlaw.com*
JEFFREY J. ZUBER (SBN 220830)
  *jzuber@zuberlaw.com*
A. JAMES BOYAJIAN, (SBN 275180)
  *jboyajian@zuberlaw.com*
**ZUBER LAWLER & DEL DUCA LLP**
777 S. Figueroa Street, 37th Floor
Los Angeles, California  90017
Telephone: (213) 596-5620
Facsimile:  (213) 596-5621

Attorneys for Plaintiff and Counterclaim-Defendant
Leadership Studies, Inc.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LEADERSHIP STUDIES, INC., | CASE NO. 15CV1831 WQH-KSC |
| Plaintiff, | **LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION) PURSUANT TO FED.R. CIV. P 12(B) (1), AND IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56** |
| v. | |
| BLANCHARD TRAINING AND DEVELOPMENT, INC., | |
| Defendant. | |
| BLANCHARD TRAINING AND DEVELOPMENT, INCORPORATED, | |
| Counterclaim-Plaintiff, | Date:   May 22, 2017 |
| v. | Judge:  Hon. William Q. Hayes |
| LEADERSHIP STUDIES, INC., | [Filed Concurrently With Declarations and Objections |
| Counterclaim-Defendant. | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

0811-1026 / 704891.1

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................ 1

II.  STATEMENT OF RELEVANT FACTS ............................................... 3

    A.   Circumstances Surrounding The 1982 Agreement. ...................... 3

    B.   In 1984 BTD Advocated Changes To The 1982 Agreement. ............... 4

    C.   The Parties Continued To Negotiate Their Rights In The Mark. .......... 5

    D.   Since 1987 The Parties Consistently Have Treated The 1987
        License As Governing BTD's Rights To Use The Mark. ...................... 6

    E.   BTD's Discovery Responses Confirm That The 1987 License
        Governs Its Right To Use The Mark ........................................... 7

III. LEGAL ARGUMENT .......................................................................... 7

    A.   Summary Judgment Is The Appropriate Standard Of Review. ............. 8

        1.   The Motion Cannot Be Determined As A Motion To
            Dismiss .............................................................................. 8

        2.   Disputed Material Facts Preclude Summary Judgment. ............. 8

        3.   Jurisdictional Dismissal In Federal Question Cases Is
            Exceptional. ...................................................................... 9

    B.   The 1987 License Superseded The 1982 Release ............................. 10

        1.   The 1987 License Covers The Same Subject Matter As
            The 1982 Agreement: Ownership & Use Of The Mark. ............. 10

        2.   Later Contracts Between Parties That Cover The Same
            Subject Matter Supersede Earlier Contracts. ........................... 11

        3.   Superseding Contracts Do *Not* Have To Recite That They
            Replace Earlier Contracts. .................................................... 14

            (a)   The Parties' Conduct Leading Up To The 1987
                License Confirms This Intent. ........................................ 15

            (b)   The Parties' Conduct From 1987 Forward Confirms
                This Intent ................................................................. 16

            (c)   BTD's Claim That The 1987 License Did Not
                 Replace The 1982 Agreement Precludes Summary
                Judgment ................................................................... 17

    C.   The 1982 Agreement's Release Was Limited As A Matter Of
        Law ................................................................................... 17

    D.   Even If The 1987 License Did Not Supersede The 1982

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Agreement BTD Waived Its Rights Under The 1982 Agreement And Is Estopped From Raising It As A Defense. ............................................... 19

E.     The Facts Refute BTD's Supposed Concealment Conspiracy. ........... 21

F.     BTD Is The Party Liable For Attorney Fees ........................................ 23

IV.    CONCLUSION ............................................................................................. 25

LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Accord American Dawn, Inv. v. Linen*
   No. CV 13-3713 DMG (JEMx), 2014 WL 11430940, (C.D. Cal. Dec.
   29, 2014)...............................................................................................................15

*Airs Intern., Inc. v. Perfect Scents Distr., Ltd.*
   902 F. Supp. 1141 (N.D. Cal. 1995) ...................................................................13

*Already LLC v. Nike, Inc.*
   568 U.S. 85, S. Ct. 721 (2013) ............................................................................10

*Barbour v. Unum Life Ins. Co. of America*
   803 F. Supp. 2d 115 (S.D. Cal. 2011) ...................................................................8

*Bell v. Hood*
   327 U.S. 678 (1946) ...............................................................................................9

*Britz Fertilizers, Inc. v. Bayer Corp.*
   665 F. Supp. 2d 1142 (E.D. Cal. 2009).................................................................21

*Brookview Condominium Owners' Assn. v. Heltzer Enterprises-Brookview*
   218 Cal. App. 3d 502 (1990)...........................................................................20, 21

*Crain v. Burroughs Corp.*
   560 F. Supp. 849 (C.D. Cal. 1983) ......................................................................12

*Crossen v. Foremost-McKesson, Inc.*
   537 F. Supp. 1076 (N.D. Cal. 1982) ....................................................................12

*Fanucchi & Limi Farms v. United Agri Products*
   414 F.3d 1075 (9th Cir. 2005)..............................................................................15

*Fashion Intern. Corp. v. Style Cos., Ltd.*
   760 F.2d 1045 (9th Cir. 1985)..............................................................................23

*Gabriel Technologies Corp. v. Qualcomm Inc.*
   No. 08cv1992–MMA(POR), 2009 WL 3326631,  (S.D. Cal. Sept. 3,
   2009).......................................................................................................................17

*Gibson Guitar Corp. v. Viacom Intern. Inc.*
   No. CV 12–10870 DDP (AJWx), 2013 WL 3779593, (C.D. Cal. July
   13, 2013).................................................................................................................24

*Gin v. Chicago Ins. Co.*
   106 F.3d 407,  (9th Cir. 1997)..............................................................................23

*Gurvey v. Legend Films, Inc.*, No. 309CV00942AJBBGS
   2013 WL 12090309, (S.D. Cal. Apr. 8, 2013) .....................................................24

0811-1026 / 704891.1

*Han v. Mobil Oil Corp.*
   73 F.3d 872 (9th Cir. 1995) ............................................................ 12

*Harrison Western Corp. v. U.S.*
   792 F.2d 1391 (9th Cir. 1986) ................................................. 12, 13

*Honda v. Reed*
   156 Cal. App. 2d 536 (1958) ...................................................... 12

*Howard v. County of Amador*
   220 Cal. App. 3d 962 (1990) ...................................................... 17

*Hunt v. Smyth*
   25 Cal. App. 3d 807 (1972) ........................................................ 15

*James v. Comcast Corp.*
   No. 16-cv-02218-EMC, 2016 WL 4269898, (N.D. Cal. Aug. 15, 2016) ....... 13

*JAT Wheels Inc. v. JNC Wheel Collection*
   No. CV 14-04898 JVS MRWX, 2014 WL 4568323, (C.D. Cal. Sept. 8, 2014) ............................................................................. 24

*JLG Enterprises, Inc. v. Excalibur Sires, Inc.*
   No. 1:10–cv–02138–AWI–SKO, 2011 WL 1103325, (E.D. Cal. Mar. 22, 2011) ............................................................................ 15

*Lozano v. Cabrera*
   No. 15-55535, 2017 WL 506985 (9th Cir. Feb. 7, 2017) ................... 8

*Maudlin v. Pac. Decision Scis. Corp.*
   137 Cal. App. 4th 1001 (2006) .................................................. 18

*Mitsubishi Aircraft Intern., Inc. v. Brady*
   780 F.2d 1199 (5th Cir. 1986) ................................................... 13

*Motown Record Corp. v. Brockert*
   160 Cal. App. 3d 123 (1984) ...................................................... 13

*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.*
   144 Cal. App. 4th 1175 (2006) .................................................. 19

*Olympic Finance Co. v. Thyret*
   336 F.2d 62 (9th Cir.) *cert. den.* 380 U.S. 963 (1964) ................... 17

*Phat Fashions, L.L.C. v. Phat Game Athletic Apparel, Inc.*
   No. 01C1771, 2002 WL 570681, (E.D. Cal. Mar. 20, 2002) ............... 22

*Rambus, Inv. v. Samsung Electronics Co., Ltd.*
   Nos. C-05-02298 RMW, C-05-00334 RMW, 2008 WL 3875397, (N.D. Cal. 2008) ...................................................................... 21

*Reed v. Williams*
   No. CIV S–05–0060 JAM GGH P, 2009 WL 1259023, (E.D. Cal. May 5, 2009) ................................................................................. 24

0811-1026 / 704891.1

*River Garden Farms, Inc. v. Superior Court*
   26 Cal. App. 3d 986 (1972) ............................................................................. 11

*Rosales v. FitFlop USA, LLC*
   No. 11-CV-0973 W KSC, 2013 WL 3049122, (S.D. Cal. June 17,
   2013) ................................................................................................................ 23

*San Diego Hospice v. County of San Diego*
   31 Cal. App. 4th 1048 (1995) ......................................................................... 18

*Santisas v. Goodin*
   17 Cal. 4th 599 (1998) .................................................................................... 14

*Sharaf v. Starbuzz Tobacco, Inc.*
   No. SACV 14-00541 JVS(DFMx), 2016 WL 6275166,  (C.D. Cal. Jan.
   29, 2016) .......................................................................................................... 16

*Shaw v. Jar-Ramona Plaze, LLC*
   No. 5:13–cv–01563–CAS(SPx), 2015 WL 1275294, (C.D. Cal. Mar.
   16, 2015) ............................................................................................................ 9

*Sime v. Malouf*, 95 Cal. App. 2d 82 (1949) ..................................................... 19

*Skrbina v. Fleming Companies*
   45 Cal. App. 4th 1353 (1996) ........................................................................... 9

*Sun Valley Gas., Inc. v. Ernst Enters.*
   711 F.2d 138 (9th Cir.1983) .............................................................................. 9

*SunEarth, Inc. v. Sun Earth Solar Power Co.*
   839 F.3d 1179 (9th Cir. 2016) ......................................................................... 24

*Thiele v. Merrill Lynch, Pierce, Fenner & Smith*
   59 F. Supp. 2d 1067 (S.D. Cal. 1999) ...................................................... 12, 13

*U.S. ex rel. Int'l Contracting Co. v. Lamont*
   155 U.S. 303 (1894) ....................................................................................... 13

*Villacres v. ABM Industries, Inc.*
   189 Cal. App. 4th 562 (2010) ......................................................................... 18

*Yufa v. TSI Inc.*
   No. 09-CV-01315-KAW, 2014 WL 4071902,  (N.D. Cal. Aug. 14,
   2014) ................................................................................................................ 24

**STATE CASES**

California Civil Code section 1638 ..................................................................... 14

**STATE STATUTES**

Cal. Civ. Code § 1530 ........................................................................................ 12

Cal. Civ. Code § 1542 ........................................................................................ 18

vi                                            Case No. 15CV1831 WQH-KSC
LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

Cal. Civ. Code § 1698.............................................................................................12

California Civil Code section 1542 .........................................................................18

**RULES**

Federal Rule of Civil Procedure 12(b)(1)...................................................................8

Case No. 15CV1831 WQH-KSC

LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   PRELIMINARY STATEMENT

Blanchard Training and Development, Inc.'s ("BTD") instant Motion to Dismiss or for Summary Judgment (the "Motion") ignores major disputes of material facts affecting the legal assertions in its Motion. Since 1987, both BTD and Plaintiff Leadership Studies, Inc. dba Center for Leadership Studies ("CLS") consistently have treated their license agreement dated December 19, 1987 ("1987 License") as the *sole* contract that governs BTD's use of both CLS' mark, "Situational Leadership®" (the "Mark"), and its trademarked four-quadrant logo. BTD's Motion flippantly leapfrogs over not only the negotiation and adoption of the 1987 License, but nearly thirty years of practice between the parties.

Instead, BTD bases its Motion on a prior one-line clause in a 1982 agreement ("1982 Agreement") in which one of CLS' predecessors in interest, Leadership Studies Productions, Inc. ("LSP"),[1] *a mere licensee of the Mark*, agreed to forebear suing BTD concerning the Mark in the context of then-pending litigation concerning a dispute with Video University ("Video"). BTD's reliance on this 1982 Agreement is not only misplaced but specious for several reasons.

Most importantly, as a matter of fact and law, the 1987 License completely replaced the 1982 Agreement with regard to the parties' respective rights to the Mark. Because the 1987 License covered the exact same subject matter, the parties' rights vis-à-vis the Mark, it fully superseded the 1982 Agreement. BTD cites *no legal authority* for its assertion that the 1987 License could not supersede the 1982

---

[1]   BTD's contests CLS' use of the term "predecessor in interest," but this issue is a red herring. LSP changed its name to "Leadership Studies" and later merged with MED. Because CLS' based its business in California the company chose Leadership Studies as the merger's survivor. The company later changed its name to "Leadership Studies, Inc.," the present plaintiff. All of this was a matter of public record that BTD desperately strives to transmogrify into an elaborate concealment conspiracy. Settled law precluded any incentive for CLS to rewrite history the way that BTD now strives to do. *See, infra*, §III.__.

1  Agreement because it lacked an integration or merger provision because the case law

2  overwhelmingly holds otherwise.  Indeed, the 1987 License requires that BTD

3  perform obligations as licensee that would be illusory if CLS could never enforce.

4      The facts – including ones that BTD ignores – support CLS' position.

5      First, Ken Blanchard wrote *to MED* – the entity that held the then common law

6  rights in the Mark – *in 1984* and asserted that the 1982 Agreement applied to BTD's

7  use of the Mark.  He suggested modifications to the agreement necessary to preserve

8  the Mark's validity.  Ensuing negotiations led to the comprehensive 1987 License

9  which provided that BTD was a *licensee* of the Mark, *and gave BTD additional rights*

10  *to which it was not entitled under the 1982 Agreement*.  Initial drafts of the agreement

11  included both MED and LSP as parties, but the final 1987 Agreement, *after their*

12  *merger*, was only with Leadership Studies, the surviving entity.  Indeed, if BTD's

13  interpretation were correct, and the 1982 Agreement bared any claims by CLS, the

14  1987 License would be unnecessary, because a broad covenant not to sue would result

15  in a perpetual, unconstrained license. Dr. Blanchard's 1984 letter confirmed the need

16  for additional terms to protect the Mark from third-party infringement.

17      Second, *since the 1987 License **both parties** consistently have treated the 1987

18  License as the definitive contract governing the parties' relationship with regard to

19  the Mark.  *Not a single document* suggests that the 1982 Agreement bore any

20  relevance to BTD's use the Mark.  BTD's internal documents confirm the same thing;

21  *none* state that BTD's rights to the Mark were outside the 1987 License.

22      Third, there is a good reason for the negotiation and consummation of the 1987

23  LA:  BTD recognized the value of the Mark, and that protecting it served both parties'

24  interest.  Accordingly, it willingly entered into the 1987 License, which delineated

25  BTD's rights both to the Mark and the Four-Quadrant Logo, but also afforded BTD

26  several rights absent from the 1982 Agreement and settled ongoing disputes.   BTD

27  recognized that an unconditional covenant not to sue from CLS to BTD weakened the

28  strength of the Mark, and either party's right to police its use.

1   Additionally, BTD's Motion fails because (a) the 1982 Agreement did not
2   cover unknowable claims resulting from LSP's later acquisition of rights, and (b)
3   BTD's actions over nearly thirty years constitute estoppel or implied waver.

4   The facts and law establish that the 1987 License superseded the 1982
5   Agreement.  At the very least, the evidence establishes that parties dispute material
6   facts concerning the validity and meaning of the 1982 Agreement.

7   **II.   STATEMENT OF RELEVANT FACTS**

8   **A.   Circumstances Surrounding The 1982 Agreement.**

9   Starting in 1979 BTD partnered with MED and another entity in the "Center
10  for Leadership Studies" partnership (the "CLS Partnership"), which held the
11  common-law rights to the mark "Situational Leadership."  RSUMF ¶¶ 17, 29.  The
12  CLS Partnership applied with the PTO to register the Mark on October 26, 1980.
13  RSUMF ¶¶ 33.   On or about May 20, 1981, BTD exited the partnership and, in
14  exchange for $30,000.00, released its rights to the CLS Partnership's intellectual
15  property.  RSUMF ¶ 4, 18.  The CLS Partnership assigned the rights to "Situational
16  Leadership" to MED in February 19, 1982.  RSUMF ¶ 19.  When the partnership
17  dissolved, MED continued to do business as the "Center for Leadership Studies."
18  RSUMF ¶ 20.

19  In 1982 LSP, a company partially owned by MED, was in a legal dispute with
20  Video University, an entity that marketed video materials for LSP.  RSUMF ¶ 21.
21  LSP terminated its contract with Video.  *Id.*  Although its contract with LSP precluded
22  it from doing so, Video announced a contract with BTD to distribute competing
23  "Situational Leadership" videos.  *Id.*  LSP filed, but did not serve, a complaint against
24  BTD *concerning only its interference with the LSP/Video contract*.  Id.

25  LSP and BTD settled the dispute, as documented in the 1982 Agreement, under
26  which, *inter alia*, BTD agreed not to contract with Video for competing videos, LSP
27  dismissed its lawsuit against BTD, and LSP agreed not to sue BTD regarding its use
28  of the Mark while the parties negotiated a more comprehensive license.  RSUMF ¶

1   21-23.   John Myers, *President of LSP only*, signed the agreement believing that it

2   applied only to the dispute relating to Video University.  RSUMF ¶ 25-27.  The letter

3   transmitting the agreement from LSP's to BTD's counsel echoed this understanding.

4   After noting his understanding that Dr. Blanchard would *not* use the "term Situational

5   Leadership in the title or name of any of his materials or writings," CLS' lawyers

6   stated "I represent to you that we will take *no action with regard to Dr. Blanchard or*

7   *the lawsuit filed in San Diego*, or in any other way prejudice the rights of Dr.

8   Blanchard in the use of the term Situational Leadership *at this time.*"  RSUMF ¶ 23.

9   (emphasis added).  CLS is not aware of any response to this letter from BTD.

10   **B.   In 1984 BTD Advocated Changes To The 1982 Agreement.**

11   Two years later, on May 18, 1984, Dr. Blanchard wrote to Ralph Hersey

12   ("Ralph"), Dr. Hersey's brother and MED's then Vice-President of Marketing.

13   RSUMF ¶ 25-27.  There is no doubt that he addressed Ralph in his capacity at MED

14   because the letter refers to "your new logo registration" and "your attempt to register

15   the term 'Situational Leadership' was abandoned," both actions that were taken *by*

16   *MED and not LSP*.  *Id.*  He indicated that he "look[s] at our discussions over the logo

17   as *an opportunity for mutually beneficial cooperation to protect our interest against*

18   *unauthorized use of the Situational Leadership term and symbol.*"  *Id*. (emphasis

19   added).  Dr. Blanchard left no doubt that **he** considered that the 1982 Agreement

20   governed BTD's then-existing right to use the Mark *from MED*.  *Id.*  ("I am sure you

21   are aware of the June, 1982 agreement which John Myers and I signed in which it was

22   agreed that *you* 'would not pursue a violation of the trademark actions now or in the

23   future as it refers to Situational Leadership.'") (emphasis added).  Although contrary

24   to John Myers' understanding and the cover letter transmitting the agreement, this

25   letter reflects *Dr. Blanchard's then state-of-mind*, *i.e.* that it was a general release

26   from all Hersey-related companies regarding the use of the Mark.

27   In his letter, Dr. Blanchard suggested, with regard to the Situational Leadership

28   "term and symbol," that both parties work "together but following your lead (MED)

4                             Case No. 15CV1831 WQH-KSC
LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

1    [to] make their use exclusive to our two organizations." *Id.* He observed that arguing

2    between the companies could result in the marks being "open for anyone's use." *Id.*

3    Dr. Blanchard suggested that BTD "formally agree" to place the "™" symbol next to

4    the Mark, something it was not required to do under the 1982 Agreement. *Id.*; *see*

5    *also* Blanchard Decl. [D.E.65-8, ¶5, confirming that he wanted a contract between

6    BTD and "Paul Hersey's Companies."] Finally, he offered that BTD would "take the

7    lead in drafting a simple agreement which confirms CLS's lead position in defending

8    both of our rights around Situational Leadership." *Id.* This letter recognized that the

9    parties needed to, at the very least, modify their existing agreement to clarify the

10   parties' respective rights to the Mark, consistent with 1982 Agreement's transmittal

11   letter. *Id.* Although *Dr. Blanchard possibly* thought, or even preferred, a new

12   supplement the 1982 Agreement, the subsequent negotiations and the terms of the

13   1987 License revised the parties' relationship. RSUMF ¶ 31-32.

14       **C.    <u>The Parties Continued To Negotiate Their Rights In The Mark</u>.**

15       On October 26, 1984 MED filed a new application with the USPTO for the

16   Mark "Situational Leadership." RSUMF ¶ 33. The USPTO granted the application,

17   and registered the mark "Situational Leadership®" as of November 26, 1985. *Id***.**

18       On July 15, 1985, LSP filed a Certificate of Amendment to its Articles of

19   Incorporation changing its name to "Leadership Studies" with California's Secretary

20   of State. RSUMF ¶ 34. On September 23, 1985 Leadership Studies, merged with

21   MED, as reflected in the Agreement of Merger filed with California's Secretary of

22   State on March 21, 1986. RSUMF ¶ 35. The agreement designated Leadership

23   Studies as the surviving entity. *Id***.** California's and Ohio's Secretary of State sites

24   both show that MED was "merged out." RSUMF ¶ 37.

25       Meanwhile, from at least 1984, the parties continued to negotiate BTD's ability

26   to use the Mark. In fits and starts the parties exchanged correspondence – and even a

27   draft lawsuit by CLS – concerning the Mark and the terms and conditions of a license

28   *from MED and LSP* and, later, CLS, to BTD. RSUMF ¶ 38. Correspondence between

0811-1026 / 704891.1

1    counsel the parties' counsel documents their negotiations and establishes that BTD
2    never asserted that it could freely use the Mark as the result of the 1982 Agreement.
3    RSUMF ¶ 39.  Notably, a draft dated June 1985 identified *both MED and LSP* as the
4    Hersey-related parties to the proposed agreement.  RSUMF ¶ 40.  In the final 1987
5    Agreement, after their merger in late 1985, the surviving party, Leadership Studies
6    was the contracting Hersey party.  RSUMF ¶ 31, 32, 41.  Of course, there would have
7    been no point in imposing obligations on BTD in the 1987 License regarding the Mark
8    sense if CLS could never enforce them due to the 1982 Agreement.

9         After BTD and CLS executed the 1987 License Dr. Blanchard circulated an
10   internal BTD memo in which he described the agreement as "good news" because
11   "not having a signed agreement *with Paul has been a very dangerous position*"; this
12   validates CLS's position that BTD did not have the benefit of a broad covenant not to
13   sue, but resolved that issue in the new agreement.  RSUMF ¶ 42. (emphasis added).
14   Dr. Blanchard explained that the parties had agreed to a royalty-free license to use
15   "Situational Leadership®."   *Id.*  He emphasized that "[g]etting the rights to use
16   Situational Leadership gives us all kinds of freedom *and also ensures that if Hersey*
17   *ever sold his company to someone else we would have first dibs on buying out the*
18   *Situational Leadership concept from any such deal.*" *Id.* (emphasis added).  He also
19   noted that the agreement allowed CLS *and* BTD to police the Mark.  *Id.*  He reflected
20   that "[f]inalizing our legal use of Situational Leadership makes me feel even better –
21   it's been a long, slow road."   *Id.*   Although Dr. Blanchard also had signed the
22   declaration that formed part of the 1982 Agreement, and had reminded Ralph of its
23   existence in 1984, his memo made no mention of it.  *Id.*  BTD, like CLS, considered
24   the 1987 License as the comprehensive instrument governing the parties' respective
25   rights in the Mark.

26       **D.**    **Since 1987 The Parties Consistently Have Treated The 1987**
27             **License As Governing BTD's Rights To Use The Mark.**
28       It is indisputable that, since its execution, BTD unfailingly has treated the 1987

6    Case No. 15CV1831 WQH-KSC
LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

1  License as the document that governs its right to use the Mark. Since 1987, BTD,

2  internally, has referred solely to the 1987 License as governing its right to use the

3  Mark.  RSUMF ¶ 39, 43.  The same has been true in its communications with CLS.

4  RSUMF ¶ 44.

5  As an example, in 2013, after Maureen Shriver assumed CLS' Presidency, she

6  reached out to Dr. Blanchard and Richard Andrew, and requested that they provide

7  her with any documents of which she should be aware that addressed the parties'

8  relationship other than the 1987 License.  RSUMF ¶ 45.  She wanted to be sure that

9  she was fully aware of all agreements between the parties and that everyone was on

10 the same page.  *Id*█████████████████████████████████████████████

11 ███████████████████████████████████████████████████████████████

12 █████████████████████████████████.  RSUMF ¶ 46.  Neither he nor Dr.

13 Blanchard mentioned the 1982 Agreement; BTD's response confirmed what Ms.

14 Shriver understood, *i.e.* that the 1987 License completely governed BTD's rights to

15 use the Mark, as well as the four-quadrant logo.  RSUMF ¶ 47.

16 **E.**  **BTD's Discovery Responses Confirm That The 1987 License**

17 **Governs Its Right To Use The Mark.**

18 Despite its present contentions, BTD's discovery responses acknowledge that

19 it uses the mark "Situational Leadership®" pursuant to the terms of the 1987 License.

20 Zuber Decl. ¶ 38-39. These responses do not mention the 1982 Agreement let alone

21 claim any rights to the Mark under that agreement.  *Id.*

22 **III.**  **LEGAL ARGUMENT**

23 Although voluminous documents produced by *both parties* establish that *both*

24 parties recognize that the 1987 License governs BTD's rights to use the Mark, BTD

25 now asserts that the 1982 Agreement overrides that agreement and bars CLS'

26 trademark claims.  Its perplexing suggestion that CLS surreptitiously concealed its

27 identity is specious and belied by both the documents leading up to the 1987 License

28 including those available in the public record.  Indeed, it strains credulity to believe

1   that, throughout the negotiations, and over the past thirty years, no one from BTD
2   asked about LSP, the entity that ostensibly had granted broad it a broad covenant not
3   to sue.  There were no such inquiries because the parties' intent to replace the 1982
4   Agreement with the 1987 License was never in doubt until BTD's counsel concocted
5   this theory despite overwhelming evidence *and law* to the contrary.

### A.    Summary Judgment Is The Appropriate Standard Of Review.

#### 1.    The Motion Cannot Be Determined As A Motion To Dismiss.

8   BTD suggests that the Court can decide its Motion under Federal Rule of Civil
9   Procedure 12(b)(1) ("Rule 12(b)(1)").  As confirmed in a case *BTD cited*, *Lozano v.*
10  *Cabrera*, No. 15-55535, 2017 WL 506985 (9th Cir. Feb. 7, 2017), because BTD relies
11  on evidence outside the pleading including the 1982 Agreement, resolution of its
12  claims under Rule 12(b)(1) is improper.  *Id.* at *1.

#### 2.    Disputed Material Facts Preclude Summary Judgment.

14  BTD's Motion ignores the disputed material facts of which it is well-aware.
15  "[A]t the summary judgment stage the judge's function is not himself to weigh the
16  evidence and determine the truth of the matter but to determine whether there is a
17  genuine issue for trial."  *Anderson,* 477 U.S. at 250.  "In ruling on a motion for
18  summary judgment, the Court must view all inferences drawn from the underlying
19  facts in the light most favorable to the nonmoving party."  *Strong v. Walgreen Co.*,
20  No. 09cv611WQH(BLM), 2009 WL 3711930, at *3 (S.D. Cal. Nov. 3, 2009) (Hayes,
21  J.) (citing Fed. R. Civ. Proc. 56 and *Celotex*) (citation omitted).  "'Credibility
22  determinations [and] the weighing of evidence ... are jury functions, not those of a
23  judge, [when] he is ruling on a motion for summary judgment.'"  *Id.* (citing *Anderson*;
24  modifications in original); *see also Barbour v. Unum Life Ins. Co. of America*, 803 F.
25  Supp. 2d 115, 1142 (S.D. Cal. 2011) (Hayes, J.) ("The opposing party's evidence is
26  to be believed, and all justifiable inferences are to be drawn in her favor.").  "Summary
27  judgment is appropriate . . . where ***the moving party*** *demonstrates* ***the absence of a***
28  ***genuine issue of material fact*** and entitlement to judgment as a matter of law."

0811-1026 / 704891.1

1   *Strong*, 2009 WL 3711930, at \*3.   BTD knew it could not do so when it filed the

2   Motion. The Court must conclude either that the 1982 Agreement has no bearing on

3   CLS' claims, as a matter of law, or that there are material disputed facts concerning

4   its continuing relevance.

### 3.   Jurisdictional Dismissal In Federal Question Cases Is Exceptional.

7        "Jurisdictional dismissals in cases premised on federal-question jurisdiction are

8   exceptional, and must satisfy the requirements specified in *Bell v. Hood*, 327 U.S. 678

9   . . . (1946)."   *Sun Valley Gas., Inc. v. Ernst Enters*., 711 F.2d 138, 140 (9th Cir.1983).

10   "Jurisdictional finding of genuinely disputed facts is inappropriate when 'the

11   jurisdictional issue and substantive issues are so intertwined that the question of

12   jurisdiction is dependent on the resolution of factual issues going to the merits' of an

13   action."   *Id.* at 139 (citations omitted).   As discussed herein, facts calls into question

14   the relevance and application, if any, of the 1982 Agreement.   Indeed, "the failure of

15   a plaintiff to establish a federal cause of action upon which relief may be granted is a

16   question going to the merits of an action.   [The Plaintiff's] claim, premised as it is on

17   federal-question jurisdiction, must therefore be adjudicated on the merits."   *Id.* at 140.

18   Here, whether or not CLS has established its causes of action under Federal trademark

19   law is intertwined with the questions of law *and fact* concerning the relevance, if any,

20   of the 1982 Agreement so must be adjudicated on its merits.

21        BTD's reliance on *Shaw v. Jar-Ramona Plaze, LLC*, No. 5:13–cv–01563–

22   CAS(SPx), 2015 WL 1275294, at \*6 (C.D. Cal. Mar. 16, 2015) is misplaced because,

23   there, the plaintiff did not dispute the existence or the effectiveness of the settlement

24   agreement.   *Id.* at \*6 (the plaintiff signed a settlement agreement *in the context of the*

25   *pending litigation* addressing damages arising out of the defendant's architectural

26   barriers, so he was barred from seeking injunctive relief over the same barriers); *see*

27   *also Skrbina v. Fleming Companies,* 45 Cal. App. 4th 1353, 1366 (1996) (cited by

28   BTD) (granting "summary judgment because plaintiff *failed to show the existence of*

0811-1026 / 704891.1

1    *a triable issue of fact as to the validity and scope of the release* he signed, and *absent*

2    *such an issue of fact* the release bars his suit as a matter of law.") (emphasis added).

3    Here, CLS submits abundant evidence that shows the 1982 Agreement no longer is

4    effective creating triable issues of fact.

5    **B.    The 1987 License Superseded The 1982 Release.**

6        The evidence shows that *no one at BTD or CLS* thought the 1982 Agreement

7    as governed their relationship regarding the Mark after December 1987.  The parties

8    knew the 1987 License superseded and replaced the 1982 Agreement, as a matter of

9    law, because it comprehensively addresses the parties' rights to the Mark and is

10   inconsistent with the 1982 Agreement.  BTD's Motion ignores the facts and law.

11           **1.    The 1987 License Covers The Same Subject Matter As**

12                 **The 1982 Agreement: Ownership & Use Of The Mark.**

13       The 1987 License was intended, and operated, to cover the same subject matter

14   as the 1982 Agreement: ownership and use of the Mark as between CLS and BTD.

15   Even before BTD executed the 1987 License, it recognized that *both* parties had an

16   interest in protecting the Mark from third-party infringement.  The 1982 Agreement,

17   while ostensibly creating an unfettered license running to BTD, also had numerous

18   drawbacks.  First, its very existence could weaken the Mark's strength.  *See, e.g.,*

19   *Already LLC v. Nike, Inc.*, 568 U.S. 85, --, 133 S. Ct. 721, 731 (2013) (noting that

20   "granting covenants not to sue may be a risky long-term strategy for a trademark

21   holder" because they can be construed as naked licenses).  Second, it did afford BTD

22   *no right* to police the Mark.  RSUMF ¶ 42.  Third, it provided BTD *no rights* should

23   CLS abandon or sell the Mark.  *Id.*  Fourth*,* and perhaps most importantly to BTD,

24   the parties disputed the scope of the 1982 Agreement, resulting in many threats of

25   CLS filing suit despite the covenant upon which BTD's Motion relies and also

26   disputed BTD's right to use CLS' four-quadrant logo.

27       Correspondence between counsel for the parties document the disputes and the

28   negotiations culminating in the 1987 License.  Importantly, these documents

1    recognize the changes in the entities on the CLS "side" of the draft agreements, as

2    "MED and LSP" changed to "Leadership Studies," in the final draft.

3         BTD cannot avoid the fact that, in the 1987 License, it accepted a *license* for

4    the Mark with certain restrictions on BTD's use of the Mark which were absent from,

5    and *could not be required under*, the 1982 Agreement; however, **BTD also gained**

6    **substantive rights**.  *First*, it now could police the Mark should CLS not choose to

7    pursue an infringer.  RSUMF ¶ 31-32, 42.  *Second*, it provided that, if CLS ceased

8    using the Mark, it would transfer its rights in the Mark to BTD.  *Id*.  *Third*, BTD

9    obtained a right of first refusal should CLS wish to sell its rights in the Mark to a third

10   party.  *Id*.  *Fourth*, BTD gained the right to sublicense use of the Mark to its affiliates.

11   *Id*.  *Finally*, the 1987 License afforded BTD the right to use a version of CLS' four-

12   quadrant logo in a non-trademark sense, resolving an ongoing dispute between the

13   parties.  *Id*.  **The 1982 Agreement afford BTD none of those rights**.

14        The 1987 License also *served the parties' mutual interest* in that it afforded

15   greater protection against infringing third parties because it (a) contained restrictions

16   on BTD's use in a manner that strengthened the Mark, (b) required BTD to assist in

17   gathering materials to support renewed applications for the Mark, and (c) allowed

18   both parties input in policing infringement of the Mark.  *Id*.

19        Critically, the 1987 License contains **imposes obligations on BTD that directly**

20   **conflict with** the 1982 Agreement's covenant.  CLS could not enforce those

21   obligations if the 1982 Agreement remained viable.

22                    **2.    Later Contracts Between Parties That Cover The Same**

23                           **Subject Matter Supersede Earlier Contracts**.

24        Although BTD now desperately seeks to "resuscitate" the 1982 Agreement to

25   bar CLS' claims, that agreement is dead, and has been so for almost 30 years.  This is

26   not news to either party.

27        A covenant not to sue is a contract.  *River Garden Farms, Inc. v. Superior Court*,

28   26 Cal. App. 3d 986, 1000 (1972) (citations omitted).  "California law . . .  provides

11                    Case No. 15CV1831 WQH-KSC
LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

1  that a subsequent written contract supersedes a prior written contract."  *Crain v.*
2  *Burroughs Corp.*, 560 F. Supp. 849, 852 (C.D. Cal. 1983) (citing Cal. Civ. Code §
3  1698; additional citation omitted); *accord Thiele v. Merrill Lynch, Pierce, Fenner &*
4  *Smith*, 59 F. Supp. 2d 1067, 1070 (S.D. Cal. 1999) ("a partial modification 'supersedes
5  those terms to which it relates.'") (citing *Han v. Mobil Oil Corp.*, 73 F.3d 872, 876 (9th
6  Cir. 1995)).  A superseding contract is a novation.  Cal. Civ. Code § 1530 ("Novation
7  is the substitution of a new obligation for an existing one.").

8          It is well-established that the "[a]bandonment of a contract *may be implied* from
9  the acts of the parties in ***negotiating for a new and different contract concerning the***
10  ***same property or subject matter***."  *Honda v. Reed*, 156 Cal. App. 2d 536, 539 (1958)
11  (citations omitted; emphasis added).  In *Crossen v. Foremost-McKesson, Inc.*, 537 F.
12  Supp. 1076, 1077 (N.D. Cal. 1982), the court addressed a comparable situation were
13  "a subsequent written contract serve[d] to alter a prior written contract."  In *Crossen*
14  the earlier written contract allowed the plaintiff's termination only upon compliance
15  with the defendant's written personnel procedures including progressive discipline.
16  *Id.*  Three years later the parties executed a new contract that allowed the parties to
17  terminate on 60-days' notice even without cause or without notice for cause.  *Id.*  The
18  court concluded that the terms of the second contract governed the defendant's right
19  to terminate the plaintiff, not the previously-referenced personnel procedures.  *Id.*

20          The same result is reached under Federal common law.  *See Harrison Western*
21  *Corp. v. U.S.*, 792 F.2d 1391, 1393 (9th Cir. 1986) ("we conclude that any claims the
22  Government may have had against HWC under the first contract were abandoned
23  upon the signing of a second contract which was complete in itself, covered the same
24  subject matter, and contained no reservation of rights").  "[T]he *abandonment of*
25  *rights* under a contract by executing a later substituted contract *is not prevented by*
26  *protesting that rights still exist under the former.*  When the parties entered into the
27  substituted agreement there occurred an unconditional rescission of the original
28  agreement."  *Mitsubishi Aircraft Intern., Inc. v. Brady*, 780 F.2d 1199, 1202 (5th Cir.

12                                   Case No. 15CV1831 WQH-KSC
LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

1  1986) (emphasis added) (citing *U.S. ex rel. Int'l Contracting Co. v. Lamont,* 155 U.S.
2  303 (1894)); *accord Harrison*, 792 F.2d at 1393.  This doctrine applies where the
3  contracts "cannot stand together" because their terms conflict.  *Id.*

4  "As a general matter, 'the parties to a contract are free to determine for
5  themselves their respective rights and liabilities so long as the purposes and effects of
6  their agreement are lawful.' . . . *Thus, 'parties to an existing contract may, through
7  mutual consent, modify or rescind their agreement.'*"  *James v. Comcast Corp.*, No.
8  16-cv-02218-EMC, 2016 WL 4269898, at *2 (N.D. Cal. Aug. 15, 2016) (citations
9  omitted; emphasis added); *see also Harrison*, 792 F.3d at 1393 (citing *Mistubishi,
10  supra*, for the proposition that "execution of second agreement effected an
11  'unconditional rescission' of first agreement covering same subject matter,
12  notwithstanding the lack of an explicit release").

13  """In every novation there are four essential requisites: First, a previous valid
14  obligation; second, the agreement of all the parties to the new contract; third, the
15  extinguishment of the old contract; and fourth, the validity of the new one."""  *Airs
16  Intern., Inc. v. Perfect Scents Distr., Ltd.*, 902 F. Supp. 1141, 1147 (N.D. Cal. 1995)
17  (citations omitted).  The 1987 License satisfies all four conditions.

18  Here, BTD argues that the 1982 Agreement was a bald representation that LSP
19  – and apparently MED, from Dr. Blanchard's 1984 letter – would not sue BTD
20  regarding its use of "Situational Leadership."  Yet it is indisputable that the 1987
21  License *also* addresses the ownership of the registered Mark and BTD's rights to use
22  it.  The 1987 License both limited *and expanded* BTD's broad rights in the 1982
23  Agreement.

24  Both parties changed their existing positions in the 1987 License with regard
25  to the Mark.  *See, e.g., Motown Record Corp. v. Brockert*, 160 Cal. App. 3d 123, 133
26  (1984) (modification to a contract must be supported by consideration); *cf. Thiele*, 59
27  F. Supp. 2d at 1071 (prior contract is enforceable where modification or substitution
28  is *unsupported* by consideration) (citations omitted).  BTD ostensibly gave up its right

13

1  to unfettered use of the Mark suggested by the 1982 Agreement because it agreed to
2  use the Mark with designation of registration, to maintain the quality of its products
3  and delivery, and to notify CLS of any third-party infringement of the Mark.  As noted
4  above, it *gained significant rights.*

5  Ample evidence discussed above confirms BTD's motivation for this more
6  comprehensive agreement.  After the 1982 Agreement, the parties continued to
7  skirmish over their respective rights in the Mark *and other intellectual property*.  They
8  recognized that it was in their mutual best interests to preserve the Mark's goodwill
9  through a license agreement as opposed to the broad 1982 Agreement, and for BTD
10 to also have the right to police the Mark.  Furthermore the 1987 License provided
11 both parties with additional rights to each of their benefits.

12 **3.   Superseding Contracts Do *Not* Have To Recite That**
13 **They Replace Earlier Contracts.**

14 BTD assertion that the 1987 License could not have replaced the 1982
15 Agreement because there is no merger or integration clause is specious.  [D.E. 65-1,
16 p.2.]  In fact, BTD's citation to *Santisas v. Goodin*, 17 Cal. 4th 599, 608 (1998) is
17 misleading.  The case contains *no reference to merger or integration clauses*; *neither*
18 *word appears in the case*.  *Id. passim* (discussing the scope of attorney fees
19 provisions).  Likewise, California Civil Code section 1638, contains no such
20 requirement; it merely codifies that the language of the contract "govern[s] its
21 interpretation, if the language is clear and explicit, and does not involve an absurdity."
22 BTD cites no relevant authority because *none* supports its contention.

23 Although a novation requires the intent to substitute one agreement for another,
24 the second contract need not recite that it replaces an earlier agreement.  "Indeed, '*it*
25 *is not necessary to meet and state either in writing or orally that the original*
26 *contract was rescinded*. "If the intent to abandon can be ascertained from the acts and
27 conduct of the parties the same result will be attained. ***Abandonment may be implied***
28 ***from surrounding facts and circumstances*.'"'  *Fanucchi & Limi Farms v. United*

1  *Agri Products*, 414 F.3d 1075, 1082 (9th Cir. 2005) (citations omitted; emphasis

2  added).  "Courts examining a novation claim first look to the agreements themselves,

3  and, specifically, the substance of the change or changes between the old and new

4  agreements. . .  Courts may also take into consideration the conduct of the parties. . .

5  ."  *Id.*; *see also Hunt v. Smyth*, 25 Cal. App. 3d 807, 818 (1972) ("Nevertheless *it is*

6  *not necessary to meet and state either in writing or orally that the original contract*

7  *was rescinded*.") (citations omitted; emphasis added).[2]

8       Here, it is clear that the 1987 License replaced the 1982 Agreement.  The 1987

9  License created obligations directly contrary to the earlier covenant.  On the other

10  hand, BTD obtained rights under the 1987 License that not included in the 1982

11  Agreement.

**(a)     The Parties' Conduct Leading Up To The 1987 License Confirms This Intent.**

14       As BTD confirms D.E.65-1, it was well-aware of the 1982 Agreement leading

15  up to the 1987 License.  On May 18, 1984, Dr. Blanchard wrote "I am sure you are

16  aware of the June, 1982 agreement which John Myers and I signed in which it was

17  agreed that *you* 'would not pursue violation of trademark actions now or in the future

18  as it refers to Situational Leadership.' (emphasis added).][3]  *This letter demonstrates*

19  *that, as of its writing in 1984, Dr. Blanchard believed that the 1982 Agreement*

20  *governed both LSP's and MED's right to sue BTD over the Mark.  See, supra*,

21  _____.

22       Dr. Blanchard's letter recognized that the parties needed to modify their

---

24  [2]  *Accord American Dawn, Inv. v. Linen*, No. CV 13-3713 DMG (JEMx), 2014 WL
11430940, at *4 (C.D. Cal. Dec. 29, 2014) (same, citing *Flynn*); *cf. JLG Enterprises,

25  Inc. v. Excalibur Sires, Inc.*, No. 1:10–cv–02138–AWI–SKO, 2011 WL 1103325, at
*9 (E.D. Cal. Mar. 22, 2011) (no novation where new agreement "relate[d] only to

26  the sale and shipping of semen, rather than alteration of the original livestock service
agreement or the terms or payment under that contract").

27  [3]  The simple language of the 1982 Covenant did not address the rights of parent
or related companies.  Nevertheless, Dr. Blanchard clearly believed it did in his 1984

28  letter.  That perception, whether legally correct or not, affected his negotiation of the
1987 License, which clarified and modified BTD's rights to use the Mark.

1   existing agreement. ███████████████████████████████████████████

2   █████████████████████████████l.  The final contract over three

3   years later exceeded the scope suggested in the 1984 letter.  However, the 1987

4   License shows on its face that the parties negotiated a new agreement that covered

5   BTD's rights to use "Situational Leadership®."

6        Consistently, the name of the contracting parties changed over time.  Although

7   a 1985 draft identified *both* MED and LSP *shortly before their merger later that year,*

8   when the parties finalized the contract in 1987, Leadership Studies the surviving

9   corporation, appeared as the sole contracting party.

10              **(b)    The Parties' Conduct From 1987 Forward**

11                    **Confirms This Intent.**

12        The parties' course of conduct since the 1987 License confirms that it resulted

13   in a novation of the 1982 Agreement.  *See Sharaf v. Starbuzz Tobacco, Inc.*, No.

14   SACV 14-00541 JVS(DFMx), 2016 WL 6275166, at *5 (C.D. Cal. Jan. 29, 2016).  In

15   *Sharaf*, the plaintiff sued the defendant for allegedly breaching a 2005 agreement.  *Id.*

16   at *1.  The defendant presented uncontroverted evidence "that the parties' course of

17   conduct from 2006 to 2009 demonstrate[d] that the parties rescinded or abandoned

18   the 2005 Agreement."  *Id.* at *5.  This course of conduct included a subsequent

19   contract in 2009 "concern[ing] a very similar subject matter" and the parties'

20   performance *of that later contract*.  *Id.* at *5.  The court granted the defendant

21   summary judgment because "no reasonable jury could find that the parties did not

22   rescind the 2005 Agreement."  *Id.* at *6.

23        The same is true here, although it warrants *denial* of BTD's Motion.  The 1987

24   License sets forth, in greater detail than the bare 1982 Agreement, BTD's rights and

25   obligations with regard to CLS' marks.  Since that time, *all* parties consistently have

26   treated the 1987 License as the operative contract governing the parties' relationship.

27   BTD repeatedly has acknowledged its obligation to use the ® symbol after the Mark

28   "Situational Leadership®."   BTD has produced *no documents*, and CLS is unaware

1  of any, in which *anyone* at BTD even suggested after 1987 that the 1982 Agreement
2  allowed BTD unrestrained use of the Mark, or that BTD was not bound by the terms
3  of the 1987 License.   To now suggest otherwise is disingenuous.

4  (c)  **BTD's Claim That The 1987 License Did Not**
5  **Replace The 1982 Agreement Precludes**
6  **Summary Judgment.**

7  BTD's disputation of the conclusion that the 1987 License replaced and
8  superseded any rights under the 1982 Agreement creates a disputed issue of material
9  fact.  *See, e.g., Gabriel Technologies Corp. v. Qualcomm Inc.*, No. 08cv1992–
10  MMA(POR), 2009 WL 3326631, at *4 (S.D. Cal. Sept. 3, 2009) ("'Where there is
11  conflicting evidence the question whether the parties to an agreement entered into a
12  modification or a novation is a question of fact'" but concluding that "it is simply not
13  plausible that the 1999 license agreement survived the 2006 license agreement")
14  (citing *Howard v. County of Amador*, 220 Cal. App. 3d 962, 980 (1990)); *see also*
15  *Olympic Finance Co. v. Thyret*, 336 F.2d 62, 65-66 (9th Cir.) *cert. den.* 380 U.S. 963
16  (1964) (the existence of novation is a question of fact that turns on the facts and
17  circumstances of the particular case).

18  Accordingly, should this Court conclude that, if it cannot determine that the
19  1987 License superseded the 1982 Agreement as a matter of law, the *factual* dispute
20  as to whether or not it was superseded precludes summary judgment.

21  C.  **The 1982 Agreement's Release Was Limited As A Matter Of Law.**

22  In the alternative, CLS does not contest the legal conclusion that, here, a
23  covenant not to sue should be treated as a release.  However, because the 1982
24  Agreement was a release, it also must be construed as such.  As a result, even if the
25  1987 License did not supersede it, the 1982 Agreement does not bar CLS' claims.

26  Mr. Myers' understanding as reinforced by CLS' counsel transmittal letter to
27  BTD, was that the 1982 Agreement was a special release, limited to the disputes
28  between LSP and BTD relating to Video University.  RSUMF ¶ 9. When he signed

17

Case No. 15CV1831 WQH-KSC
LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

1  the release, LSP's only rights were as a licensee of the Mark, so that is all it could

2  release.  He could not waive rights LSP did not have over a Mark that it did not own.

3  LSP could not have known or suspected that BTD, in the future, would infringe on

4  rights that LSP would only later acquire.[4]

5          Nevertheless, Dr. Blanchard's 1984 letter asserted that the 1982 Agreement

6  was a general release running from all Hersey entities to BTD in connection with the

7  Mark.  "'The rule for releases is that absent special vitiating circumstances, a general

8  release bars claims based upon events occurring prior to the date of the release.'"

9  *Villacres v. ABM Industries, Inc.*, 189 Cal. App. 4th 562, 589 (2010) (citation

10 omitted).  However, its application to unaccrued and unknowable future claims would

11 be subject to California Civil Code section 1542 ("Section 1542") which provides:

12         A general release *does not extend to claims which the creditor does not*
13         *know or suspect to exist* in his or her favor at the time of executing the
           release, *which if known by him or her must have materially affected his*
14         *or her settlement with the debtor.*

15 Cal. Civ. Code § 1542 (emphasis added); *see San Diego Hospice v. County of San*

16 *Diego*, 31 Cal. App. 4th 1048, 1053 (1995) (a "general release can be completely

17 enforceable and act as a complete bar to all claims (known or unknown at the time of

18 the release)" *where* "[t]o eliminate any doubt as to the scope of the release, the parties

19 recited and expressly waived the protections afforded by [Section 1542]").  Unless

20 waived, Section 1542 limits its scope to claims that the releasor "know[s] or suspect[s]

21 to exist in [its] favor *at the time of executing the release*."

22

23 _____

24 4   BTD cites *no cases* where a party's covenant not to sue in connection with
   intellectual property rights to which it held only limited rights, later barred its ability
25 to bring claims when it subsequently gained greater intellectual property rights.  Its
   primary authority for its argument that the 1982 Agreement binds CLS, *Maudlin v.*
26 *Pac. Decision Scis. Corp.*, 137 Cal. App. 4th 1001 (2006), addressed the obligation
   of a surviving corporation to pay the debt of the absorbed company in a merger.  *Id.*
27 at 1016.  It cites no cases discussing whether a release by a surviving corporation
   applies to the intellectual property obtained as result of a merger.  Under *Maudlin*,
28 **even if MED was the surviving corporation**, *MED would have assumed LSP's*
   *obligations.*  However, *Maudlin* does not address a later agreement covered the same
   subject matter and refined the parties' respective obligations.

18                                          Case No. 15CV1831 WQH-KSC
LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

1    If BTD claims LSP released any and all claims, *including unknown future*
2    *claims including those by related entities* broadly relating to the use of the Mark, it is
3    a general release.  *See Sime v. Malouf*, 95 Cal. App. 2d 82, 110 (1949) ("While the
4    release was in general terms, and was also specific as to claims arising out of or
5    connected with the joint venture, it was not specific in any other respect, and it is to
6    be construed in the present connection as a general release").   Accordingly, if the
7    covenant not to sue in the 1982 Agreement is treated as a general release of claims
8    relating to the Mark, as opposed to a special release of LSP's claims relating to Video,
9    it cannot result in a waiver by LSP of rights that it did not have and, therefore, could
10   not have known or suspected to exist.

11       **D.    Even If The 1987 License Did Not Supersede The 1982 Agreement**
12              **BTD Waived Its Rights Under The 1982 Agreement And Is**
13              **Estopped From Raising It As A Defense.**

14       Dr. Blanchard's 1984 letter confirms that he believed that the 1982 Agreement
15   governed his rights vis-à-vis *all Hersey entities* because the "you" in the letter referred
16   to MED.  However, since the execution of the 1987 License, ***no one*** at BTD has
17   suggested that it retained an unfettered right to use the Mark, and that it was not
18   subject to claims for infringement if it breached the 1987 License.

19       Under California law, Blanchard's actions implicate either implied waiver or
20   estoppel.  *See Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.*, 144 Cal.
21   App. 4th 1175, 1189-90 (2006) ("This form of estoppel is, for practical purposes,
22   indistinguishable from the doctrine of implied waiver through conduct").  "While the
23   question of *waiver ordinarily turns on the intent* of the party against whom it is
24   asserted, *estoppel focuses solely on the party's conduct. . . .* '[*E*]*stoppel is applicable*
25   *where the conduct of one side has induced the other to take such a position that it*
26   *would be injured if the first should be permitted to repudiate its acts*.'"  *Id.* at 1189-
27   90 (internal citations and quotation marks removed; emphasis added).  ""'[C]alifornia
28   *courts will find waiver* when a party intentionally relinquishes a right or *when that*

*party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished*.""" *Id.* at 1190 (citations omitted; emphasis added); *see Brookview Condominium Owners' Assn. v. Heltzer Enterprises-Brookview*, 218 Cal. App. 3d 502, 512 (1990) (waiver refers to the act, or the consequences of the act, of one side only, while estoppel is applicable where the conduct of one side has induced the other to take such a position).

"The traditional elements of estoppel are: '"(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury."" *Oakland Raiders,* 144 Cal. App. 4th at 1189 (citations omitted).

Whether it is considered "estoppel" or "implied waiver," BTD's conduct from 1987 forward bars it from using the 1982 Agreement as a defense to CLS' trademark claims.  From 1987 forward, BTD has acted *and explicitly represented* that the 1987 License governed the parties' respective rights to the Mark.  Ms. Shriver, for one, relied, as BTD knew she would, when BTD confirmed the source of the parties' relative rights.[5]  BTD's present position, that it was "just kidding" when it continuously acted pursuant to the terms of the 1987 License for thirty years, is precisely the type of conduct barred by the estoppel doctrine.  BTD gave CLS absolutely no indication, *at any time*, that it considered the 1982 Agreement controlling.  Of course, this is because *neither* party viewed it as relevant.

Indeed, even if CLS had not relied on BTD's actions and representations for nearly thirty years, those same facts establish that BTD waived any rights under the 1982 Agreement.  "To support a finding of waiver, there must be *an existing right*,

---

[5]   In this regard, BTD's request for attorney fees is ironic.  At all times leading up to the lawsuit it has insisted that it used the Mark solely pursuant to the 1987 License, but now it seeks sanctions from CLS for asserting Lanham Act claims arising out of its breach of that agreement.

Case No. 15CV1831 WQH-KSC
LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

1    benefit, or advantage, *actual or constructive knowledge of the right's existence*, and

2    either *an actual intention to relinquish it or conduct so inconsistent with any intent to*

3    *enforce the right as to induce a reasonable belief that it has been relinquished*."

4    *Brookview*, 218 Cal. App. 3d at 513; *see Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F.

5    Supp. 2d 1142, 1164 (E.D. Cal. 2009) ("'[W]aiver may be either express, based on

6    the words of the waiving party, or implied, based on conduct indicating an intent to

7    relinquish the right.'") (citation omitted). It is inconceivable that BTD never inquired

8    prior to the 1987 License about what had happened with LSP, the company that gave

9    it a broad waiver, or bothered to check the public record.  It did not do so because the

10   name changes in the drafts leading up to the 1987 License disclosed the evolution

11   from LSP and MED to the ultimate signatory, Leadership Studies.  Armed with this

12   knowledge BTD both (a) negotiated new terms applicable to its right to use the Mark,

13   and (b) acted inconsistently with the terms of the 1982 Agreement.  This conduct led

14   CLS to the reasonable belief that only the 1987 License governed BTD's use of the

15   Mark.  Any dispute that BTD waived its rights under the 1982 Agreement, creates a

16   question of material fact that precludes summary judgment.  *Id.* ("Whether there has

17   been a waiver here is a question of fact to be determined in light of all the evidence.");

18   *see also Rambus, Inv. v. Samsung Electronics Co., Ltd.,* Nos. C-05-02298 RMW, C-

19   05-00334 RMW, 2008 WL  3875397, at *7 (N.D. Cal. 2008) (denying summary

20   judgment since the issue of waiver was a question of fact).

21       **E.    The Facts Refute BTD's Supposed Concealment Conspiracy.**

22       BTD  disingenuously  suggests  CLS  "concealed ... the  fact  that  it  and

23   Leadership Studies Productions were one and the same."  [D.E. 65-1, p.7 ll.14-15.]

24   The parties' course of dealings, CLS' initial disclosures, and public records at all

25   times readily accessible to BTD contradict its specious claim.  The 1987 License

26   replaced the 1982 Agreement as a matter of law.  BTD's fabricated issue never

27   appeared on CLS' radar, so it certainly did not attempt to "conceal" irrelevant facts.

28       In fact, CLS produced documents *in its initial disclosures* that clearly disclosed

21                          Case No. 15CV1831 WQH-KSC
LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

1     its corporate history including the MED/LSP merger and LSP's name changes.

2     Declaration of Jeff Zuber ("Zuber Decl.") submitted herewith at ¶¶ 15-21. BTD's

3     present assertion that it did not realize until recent discovery that LSP ultimately

4     became CLS lacks credulity, and appears based on its own failure to review the public

5     record and documents *including those **it** produced*. *Id.* ¶¶ 7-9, 15-21.

6        First, BTD knew MED owned the Mark even before it was registered.

7     [RSUMF 24-26.] ***Public records*** show that (a) MED was merged out of existence in

8     1985 Zuber Decl. ¶ 17, and that (b) LSP changed its name to Leadership Studies. [*Id.*

9     ¶ 19.] *Public records* likewise show that MED transferred the Mark to Leadership

10    Studies on April 3, 1986. RSUMF ¶ 36. Early drafts of the agreement *included both*

11    *MED and LSP*; the 1987 Agreement, following their intervening merger, was with

12    "Leadership Studies," the surviving entity. *Id.* ¶40. To assert that BTD could not

13    trace the chain of title from MED to Leadership Studies fka LSP strains credulity,

14    especially since mergers and trademark ownership are matters of public record. *See,*

15    *e.g.*, *Phat Fashions, L.L.C. v. Phat Game Athletic Apparel, Inc.*, No. 01C1771, 2002

16    WL 570681, at *11 (E.D. Cal. Mar. 20, 2002) ("Phat Fashions' registrations establish

17    nationwide, constructive knowledge of Phat Fashions' ownership.").

18       Second, ***both BTD and CLS*** *produced documents **in their initial disclosures***

19    *showing CLS' corporate history*. BTD produced (1) records from the Ohio Secretary

20    of State pertaining to MED; and (2) a California Secretary of State record indicating

21    that MED was "MERGED OUT." RSUMF ¶ 37. More importantly, CLS produced

22    (1) drafts of copyright registration records indicating that "Leadership Studies

23    Productions, Inc." was ultimately renamed to "Leadership Studies, Inc." and that

24    MED merged with "Leadership Studies Productions" and, (2) the MED/LS Merger

25    Agreement. Zuber Decl. ¶ 15-21. These documents reveal that MED merged into

26    LSP which became the surviving entity.

27       Documents produced by *both* parties also show the changes in the contracting

28    parties leading up to the 1987 License; these confirm that, at the time, the parties were

22              Case No. 15CV1831 WQH-KSC
LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

1    well aware of LSP's name change.  Furthermore, Dr. Blanchard signed both the

2    declaration referenced in 1982 Agreement *and* the 1987 License.  *He has never*

3    *claimed* that the 1982 Agreement governed the parties' rights since 1987.  For these

4    and other reasons, BTD's insinuation that it would have sought to dismiss the current

5    action but-for CLS' alleged "concealment" of information is specious.  [Zuber Decl.

6    ¶¶ 7-14]  Given (1) the close and lengthy relationship between the parties' principals,

7    and (2) the information available to BTD for decades, it, at best, failed to exercise

8    reasonable diligence by simply looking up information that was publicly available

9    and reviewing documents *both parties* produced.  *See, e.g.*, *Rosales v. FitFlop USA,*

10   *LLC*, No. 11-CV-0973 W KSC, 2013 WL 3049122, at *3 (S.D. Cal. June 17, 2013)

11   ("counsel's passivity and lack of diligence [was] illustrated by their [sic] failure to …

12   simply search[] public records").

13          Critically, CLS lacked and lacks motivation to "conceal" its corporate history

14   because the 1982 Agreement does not control parties' rights in the Mark, as a matter

15   of law.  It never fantasized the baseless theory BTD has concocted.

16          **F.      BTD Is The Party Liable For Attorney Fees.**

17          BTD's request for attorneys' fees is both futile and deeply ironic.  It is *BTD*

18   that has "*knowingly or recklessly* ma[de] a frivolous argument" for the improper

19   purpose of oppressively multiplying the litigation,[6] thereby rendering itself liable for

20   CLS' attorneys' fees under 18 U.S.C. section 1927 ("Section 1927") and the Court's

21   inherent power.  *Gin v. Chicago Ins. Co.*, 106 F.3d 407, at *3 (9th Cir. 1997)

22   (emphasis in original) (argument "was frivolous because it insisted upon an

23   unreasonable, strained interpretation of" a document); *Optyl Eyewear Fashion Intern.*

24   *Corp. v. Style Cos., Ltd.*, 760 F.2d 1045, 1050-51 (9th Cir. 1985) (defendants

25   _____

26   [6]      CLS notes BTD's *seriatim* Summary Judgment Motions evidence its
     multiplicity of litigation.  It filed the instant Motion on the due date CLS' Opposition
27   to its earlier Summary Judgment Motion.  D.E. 66.  Both motions fail to address
     relevant evidence, suggesting a calculated and bad faith effort to cause CLS to spend
28   needless time and fees to oppose legally unfounded motions.

1  sanctioned for bringing motion to disqualify that was "utterly without merit").[7]

2  Before filing its Motion, BTD was well-aware of the facts that show that the 1987

3  License superseded the 1982 Covenant (or, at the very least, establishing material

4  factual disputes in that area).  BTD should be sanctioned for its knowing or reckless

5  neglect of facts, causing CLS to expend pointless legal fees and time.[8]

6        Given the irrefutable evidence that neither CLS nor BTD ever treated the 1982

7  Covenant as governing their relationship after 1987, BTD has fallen far short of

8  showing the frivolousness and unreasonableness required for a finding of

9  "exceptional" under *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179,

10  1180-81 (9th Cir. 2016).  BTD's attempt impugn CLS' "pre-filing investigation"

11  [D.E. 65-1, p. 26.] by citing *Yufa v. TSI Inc*., No. 09-CV-01315-KAW, 2014 WL

12  4071902, at *3 (N.D. Cal. Aug. 14, 2014) is further ironic given *its* failure to review

13  the documents produced in CLS' initial disclosures and in the public record.  In any

14  case, *Yufa* involved patents, not trademarks, for which there is a different, specific

15  standard of pre-filing investigation.  *See JAT Wheels Inc. v. JNC Wheel Collection*,

16  No. CV 14-04898 JVS MRWX, 2014 WL 4568323, at *2 n. 6 (C.D. Cal. Sept. 8,

17  2014) (distinguishing cases in part because they "specifically involve the pre-filing

18  investigation necessary prior to filing patent claims"); *Gibson Guitar Corp. v. Viacom*

19  *Intern. Inc.*, No. CV 12–10870 DDP (AJWx), 2013 WL 3779593, at *2 (C.D. Cal.

20  July 13, 2013) ("defendants are 'rarely awarded attorney fees in trademark

21  infringement cases.'").  *Neither* party deemed the 1982 Covenant controlling as to

---

24  [7]     *Gurvey v. Legend Films, Inc.*, No. 309CV00942AJBBGS, 2013 WL 12090309, at *4 (S.D. Cal. Apr. 8, 2013) ("[inherent power] sanctions are available when recklessness is combined with an additional factor such as frivolousness, harassment, or an improper purpose"); *see Reed v. Williams*, No. CIV S–05–0060 JAM GGH P, 2009 WL 1259023, at *1, n.1 (E.D. Cal. May 5, 2009) (observing in *dicta* that serial filing of summary judgment motions was dilatory and provides grounds for sanctions under Section 1927 as it multiplies proceedings).

27  [8]     Further, as previously discussed in earlier pleadings, BTD's assertion that "[CLS] amended its complaint multiple times in response to demonstrated defects, which were evidence of a lack of pre-filing investigation" [D.E. 65-1, p. 27] is unsupported, misleading, and frivolous.  [*See* D.E. 66, p. 19 n. 10.]

LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)

0811-1026 / 704891.1

1    BTD's rights to use the Mark until BTD's recent Orwellian effort to rewrite history,

2    revive the 1982 Agreement, and ignore the 1987 License.  BTD's allegations of CLS'

3    improper motive are both unsupported and lack credence.

4    **IV.    CONCLUSION**

5          For all the foregoing reasons, BTD's Motion should be denied and CLS should

6    be awarded sanctions under Section 1927 and the Court's inherent power.

7

8    Dated: May 8, 2017                        Respectfully submitted:
                                               **ZUBER LAWLER & DEL DUCA LLP**
9                                              MICHELE M. DESOER
                                               JEFFREY J. ZUBER
10

11                                      By:  *s/Michele M. Desoer*
                                             _____
12                                           Attorneys for Plaintiff and Counterclaim-
                                             Defendant Leadership Studies, Inc.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEADERSHIP STUDIES, INC.'S OPPOSITION TO BLANCHARD TRAINING'S MOTION TO DISMISS
                    TRADEMARK CLAIMS (THIRD, FOURTH, AND FIFTH CAUSE OF ACTION)