FILED
17 DEC -1 PM 3:56

LC

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEADERSHIP STUDIES INC., <br><br> Plaintiff, <br> v. <br><br> BLANCHARD TRAINING AND DEVELOPMENT, INCORPORATED, and Does 1-10 inclusive, <br><br> Defendants. | CASE NO. 15-cv-1831-WQH-MDD <br><br> ORDER |
| BLANCHARD TRAINING AND DEVELOPMENT, INCORPORATED, <br><br> Counterclaim-Plaintiff, <br> v. <br> LEADERSHIP STUDIES INC., <br><br> Counterclaim-Defendant. | |

HAYES, Judge:

The matter before the Court is the Motion to Dismiss and, in the Alternative, Motion for Summary Judgment filed by Defendant and Counterclaim-Plaintiff Blanchard Training and Development, Incorporated. (ECF No. 65).

- 1 -

15-cv-1831-WQH-MDD

## I. Background

On August 17, 2015, Leadership Studies, Inc. ("Leadership") filed the Complaint against Blanchard Training and Development, Inc. ("Blanchard Inc.") and other unnamed individuals. (ECF No. 1). On November 7, 2016, Leadership filed the Third Amended Complaint (the "TAC"). (ECF No. 49). The TAC is the operative complaint in this matter. The TAC asserts nine causes of action. (ECF No. 49 at 1). Leadership's First Cause of Action is for Breach of Written Contract. *Id.* Leadership's Third Cause of Action is for Trademark Infringement Under the Lanham Act, § 43(A), 15 U.S.C.A. § 1125(A). *Id.* Leadership's Fourth Cause of Action is for Trademark Infringement Via Reverse Confusion Under the Lanham Act, § 43(A), 15 U.S.C.A. § 1125(A). *Id.* Leadership's Fifth Cause of Action is for Fraud in Obtaining Registered Marks under 15 U.S.C. §§ 1064(3) and 1119. *Id.*

On April 17, 2017, Blanchard Inc. filed a Motion to Dismiss Trademark Claims (Third, Fourth, and Fifth Cause of Action) pursuant to Fed. R. Civ. P. 12(b)(1) and, in the Alternative, Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56. (ECF No. 65). On May 12, 2017, Leadership filed a Response. (ECF No. 92).[1] On May 19, 2017, Blanchard Inc. filed a Reply to Leadership's Response. (ECF No. 93).

## II. Legal Standard

A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense on which summary judgment is sought. Fed. R. Civ. P. 56(a).[2] The court shall grant summary judgment if the movant shows that there is

---

[1] Leadership initially filed its response under seal. *See* ECF No. 98. Leadership has since filed an unsealed version of its Response (ECF No. 116).

[2] Blanchard Inc.'s Motion contends that Leadership cannot prevail on its Third and Fourth Causes of Action for Trademark Infringement because of a previous agreement between Blanchard Inc. and Leadership Studies Productions, Inc. (the "1982 Agreement"). (ECF No. 65 at 8). Because deciding Blanchard Inc.'s Motion requires this Court to consider the 1982 Agreement, which was not cited in the TAC, the Court will treat the Motion as a motion for summary judgment. *See Lozano v. Cabrera*, 678 F. App'x 511, 513 (9th Cir. 2017) (concluding that summary judgment was the proper standard of review because the district court considered matters outside the pleadings, specifically an earlier settlement agreement between the parties to the case).

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.* A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). The burden then shifts to the opposing party to provide admissible evidence showing that summary judgment is not appropriate. *See Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 322, 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See Anderson*, 477 U.S. at 255.

## III. Facts

### A. Background

Dr. Paul Hersey and Dr. Kenneth Blanchard worked on a theory concerning a methodology for leaders to influence others which came to be called Situational Leadership. Response to Statement of Undisputed Material Facts ("RSUMF"), ECF No. 116-3 at ¶ 1. Both Dr. Hersey and Dr. Blanchard founded businesses associated with the theory. Dr. Blanchard incorporated Blanchard Inc. in 1978. *Id.* at ¶ 3. Dr. Hersey founded Management Education & Development, Inc. ("MED") in 1976 and Leadership Studies Productions, Inc. in 1979. *Id.* at ¶ 2. In July 1985, Leadership Studies Productions, Inc. changed its name to "Leadership Studies." *Id.* MED merged into Leadership Studies in September 1985. *Id.* Leadership Studies changed its name to "Leadership Studies, Inc." in 2009. *Id.* Leadership Studies, Inc. is the plaintiff in this action. This order refers to the Plaintiff (the company named "Leadership Studies Productions, Inc.," then "Leadership Studies," then "Leadership Studies, Inc.") as "Leadership."

MED acquired the rights to the "Situational Leadership" trademark (the "Mark") in February 1982. *Id.* at ¶ 20. Leadership became the Mark's owner when MED merged into Leadership in 1985. *Id.*

**B. The 1982 Agreement**

In the first half of 1982, Leadership was in a legal dispute with Video University, a company with whom Leadership had a non-compete agreement. *Id.* at ¶ 21. Video University allegedly breached this non-compete agreement by working with Blanchard, Inc. *Id.* Leadership filed a lawsuit against Video University, and filed but did not serve a complaint against Blanchard, Inc. *Id.*

Leadership and Blanchard, Inc. entered into an agreement in June 1982 (the "1982 Agreement"). *Id.* at ¶ 22. The 1982 Agreement stated in part:

> Dear Dr. Blanchard:
> This will confirm our telephonic agreement made earlier this day
> . . . .
> You . . . advised that neither yourself nor Blanchard Training and Development, Inc. would violate the non-competition clause contained in the agreement between Leadership Studies Productions and Video University so long as that clause remained in full force and effect. . . .
> We agreed that . . . in the event there is no violation of this agreement, we would dismiss [our] suit with prejudice when the matter has been fully determined between Leadership Studies Productions and Video University. We further agree not to pursue violation of trademark action now or in the future as it refers to Situational Leadership.

(ECF No. 65-7 at 2). The 1982 Agreement was signed by John R. Myers as President of Leadership. *Id.*

In the "letter transmitting the [1982] agreement from [Leadership's] counsel to [Blanchard Inc.'s] counsel," (ECF No. 116 at 11), Leadership's attorney stated

> [Leadership] will take no further action with regard to Dr. Blanchard or the lawsuit [against Blanchard Inc.], or in any other way prejudice the rights of Dr. Blanchard in the use of Situational Leadership at this time. [Leadership] will do nothing of any kind to interfere with the use of that term (other than as it relates to Video University) until we have had an opportunity to sit down and discuss this matter and until we are able to

come to some understanding and clarification of the agreement between
Drs. Hersey and Blanchard.

(ECF No. 111-2 at 7).

In 1984, Dr. Blanchard wrote a letter to Ralph Hersey, MED's Vice-President of Marketing at the time. (ECF No. 65-7 at 11). The letter stated in part:

> I am sure you are aware of the June, 1982 agreement which John Myers and I signed in which it was agreed that you would not pursue violation of trademark actions now or in the future as it refers to Situational Leadership. As it now stands neither one of us . . . separately can prevent the use of the words or symbol of Situational Leadership, but together . . . we can make their use exclusive to our two organizations.

*Id.*

### C. The 1987 Agreement

In 1987, Leadership and Blanchard Inc. entered into another agreement (the "1987 Agreement"). *Id.* at 13. The 1987 Agreement grants Blanchard, Inc. a perpetual royalty-free license to use the Mark. *Id.* at 14. It also places certain restrictions on Blanchard Inc.'s use of the Mark. *Id.* For example, Blanchard Inc. is required to utilize the Mark "only in association with goods and services which meet or exceed a level of quality exemplified by the goods and services presently offered under the [M]ark." *Id.* The 1987 Agreement does not contain an integration clause. RSUMF at ¶ 13.

### D. Post-1987 Conduct

In 2013, Leadership's then-new President "requested that [Blanchard Inc.] provide her with any documents of which she should be aware that addressed the parties' relationship besides the 1987 License Agreement." RSUMF at ¶ 45. Dr. Blanchard's response to this request did not mention the 1982 Agreement. *Id.* at ¶ 46.

## IV. The Trademark Claims

Blanchard Inc. contends that Leadership is barred from pursuing its Third Cause of Action for Trademark Infringement and its Fourth Cause of Action for Trademark Infringement Via Reverse Confusion (collectively, the "Trademark Claims") by the following language in the 1982 Agreement: "[Leadership] further agree[s] not to

pursue violation of trademark action now or in the future as it refers to Situational Leadership" (the "Covenant Not to Sue"). (ECF No. 65-7 at 2). Leadership contends that the Covenant Not to Sue does not prevent it from bringing the Trademark Claims because the parties intended the Covenant Not to Sue to apply only "to the dispute relating to Video University" and not to the claims made in this case (the "Interpretation Issue"). (ECF No. 116 at 10). Leadership further asserts that, regardless of the intentions of the parties to the 1982 Agreement, the Covenant Not to Sue does not prevent Leadership from bringing the Trademark Claims because (1) the Covenant Not to Sue was a general release and Leadership's current claims arose after it was executed (the "Release Issue"), (2) the 1987 Agreement superseded the 1982 Agreement (the "Novation Issue"), and (3) Blanchard Inc. either waived the right to assert, or is estopped from asserting, that the Covenant Not to Sue bars Leadership's claims (the "Waiver and Estoppel Issue"). (ECF No. 116). Each issue is addressed below.

### A. The Interpretation Issue

#### 1. Contentions of the Parties

Leadership contends that the parties to the 1982 Agreement intended the Covenant Not to Sue to apply only "to the dispute relating to Video University" and only "while the parties negotiated a more comprehensive license." *Id.* at 10-11. Blanchard Inc. contends that, under the plain language of the Covenant not to Sue, Leadership agreed not to pursue any violation of trademark action against Blanchard Inc. at any time. (ECF No. 65-1 at 20-21).

#### 2. Extrinsic Evidence

Leadership requests that the Court consider certain extrinsic evidence when interpreting the Covenant Not to Sue. First, Leadership asks the Court to consider the circumstances surrounding the 1982 Agreement, specifically Leadership's lawsuit against Blanchard Inc. and Video University. (ECF No. 116 at 10). Other language

in the 1982 Agreement specifically refers to the dispute involving Video University. *See* ECF No. 65-7 at 2 ("[Dr. Blanchard] . . . advised that neither [he] nor Blanchard . . . Inc. would violate the non-competition clause . . . between Leadership Studies Productions and Video University . . . . [Leadership] agreed that . . . [it] would dismiss [its] suit with prejudice when the matter has been fully determined between Leadership Studies Productions and Video University.").

Leadership also requests that the Court consider the "letter transmitting the [1982] agreement from [Leadership's] counsel to [Blanchard Inc.'s] counsel." (ECF No. 116 at 11). In that letter, Leadership's attorney stated

> [Leadership] will take no further action with regard to Dr. Blanchard or the lawsuit [against Blanchard Inc.], or in any other way prejudice the rights of Dr. Blanchard in the use of Situational Leadership at this time. [Leadership] will do nothing of any kind to interfere with the use of that term (other than as it relates to Video University) until we have had an opportunity to sit down and discuss this matter and until we are able to come to some understanding and clarification of the agreement between Drs. Hersey and Blanchard.

(ECF No. 111-2 at 7).

Finally, Leadership requests that the Court consider a Declaration made by John Myers, who signed the 1982 Agreement as Leadership's president.[3] *See* ECF No. 65-7 at 2. Myers states:

> The statement in the 1982 Letter Agreement that, "We further agree not to pursue violation of trademark action now or in the future as it refers to Situational Leadership" was intended to be limited to the then-pending litigation that had been filed against Blanchard [Inc.] relating to the dispute concerning contracts with Video University, and not an unfettered general promise that [Leadership] would never sue Blanchard [Inc.] for any and all trademark violations . . . .

(ECF No. 80-1 at 2-3).

---

[3] Leadership also asks the Court to consider certain evidence of the parties' interactions after the 1982 Agreement. (ECF No. 116 at 11-15). The Court finds that resolving the Interpretation Issue for the purposes of this Motion for Summary Judgment does not require considering that evidence.

### 3. Applicable Law

Under California law, "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636; *Skilstaf, Inc., v. CVS Caremark Corp.*, 669 F.3d 1005, 1014-15 (9th Cir. 2012) (citing *Miller v. Glenn Miller Prods.*, 454 F.3d 975, 989 (9th Cir. 2006) (per curiam)). "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1636; *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010). "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of [the California Civil Code's Title on the Interpretation of Contracts]." Cal. Civ. Code § 1639. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Id.* at § 1641.

To interpret a written contract, courts follow a two-step analysis:

> First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence, the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step–interpreting the contract.

*F.B.T. Prods., LLC*, 621 F.3d at 963 (quoting *Winet v. Price*, 6 Cal. Rptr. 2d 554, 557 (Ct. App. 1992)). "The initial question whether a contract is ambiguous is . . . one of law." *Niederer v. Ferreira*, 234 Cal. Rptr. 779, 787 (Ct. App. 1987).

"When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law." *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (Cal. Ct. App. 2008), *as modified on denial of reh'g* (June 4, 2008) (citing *City of Hope Nat. Medical Center v. Genentech, Inc.*, 181 P.3d 142, 156 (Cal. 2008)).

If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury. (*City of Hope Nat. Medical Center*, at p. 395, 75 Cal.Rptr.3d at 350 ["when, as here, ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury"]; *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 291, . . . [it is a " 'judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence' "]. . . .)

*Id.* at 1127.

### 4. Analysis

This Court must begin the process of interpreting the Covenant Not to Sue by determining whether its "language is 'reasonably susceptible'" to Leadership's proposed interpretations. *F.B.T. Prods., LLC*, 621 F.3d at 963 (quoting *Winet*, 6 Cal. Rptr. at 557). The Court considers the extrinsic evidence offered by Leadership when making this determination. *Id.* The Covenant Not to Sue states "[Leadership] further agree[s] not to pursue violation of trademark action now or in the future as it refers to Situational Leadership." (ECF No. 65-7 at 2). Leadership contends that the Covenant Not to Sue can reasonably be interpreted to apply only "to the dispute relating to Video University" and only "while the parties negotiated a more comprehensive license." (ECF No. 116 at 10-11).

The Covenant Not to Sue explicitly provides that Leadership will not sue Blanchard Inc. for trademark violation "now or in the future." (ECF No. 65-7 at 2). That language is not reasonably susceptible to an interpretation that would impose a time limit on the applicability of the Covenant Not to Sue. However, the language of the Covenant Not to Sue is reasonably susceptible to an interpretation which would limit Leadership's promise not to sue to the dispute involving Video University. In the Covenant Not Sue, Leadership "agreed not to pursue violation of trademark action." (ECF No. 65-7 at 2). Considering the circumstances surrounding the 1982 Agreement and the language in the 1982 Agreement that specifically refers to the dispute involving

1 Video University, the phrase is reasonably susceptible to Leadership's proposed
2 interpretation. *See id.* (referencing "our lawsuit in California" and "that suit").
3 Leadership may have agreed not to bring any violation of trademark claims or
4 Leadership may have agreed not to bring the trademark infringement claim they had
5 already asserted against Blanchard Inc. in the Video University litigation. The Court
6 concludes that the Covenant Not to Sue is reasonably susceptible to either
7 interpretation.

8 Having concluded that the Covenant Not to Sue is reasonably susceptible to
9 multiple interpretations, the Court must decide whether the Covenant Not to Sue should
10 be interpreted by the Court or the jury. *See Wolf v. Walt Disney Pictures & Television*,
11 162 Cal. App. 4th 1107, 1126 (Cal. Ct. App. 2008). Under California Law, the court
12 interprets a contract "when there is no material conflict in the extrinsic evidence," and
13 a jury interprets a contract when there is such a conflict. *Wolf,* 162 Cal. App. 4th at
14 1126. A material conflict in extrinsic evidence exists when " ascertaining the intent of
15 the parties at the time the contract was executed depends on the credibility of extrinsic
16 evidence." *City of Hope Nat. Med. Ctr. v. Genentech, Inc.*, 181 P.3d 142, 156 (Cal.
17 2008) (citing *Warner Constr. Corp. v. City of Los Angeles,* 466 P.2d 996, 997 (Cal
18 1970) (In Bank)). In this case, Leadership has submitted a sworn declaration of John
19 Myers, a signatory of 1982 Agreement, stating that the Covenant Not to Sue "was
20 intended to be limited to the then-pending litigation that had been filed against
21 Blanchard [Inc.] relating to the dispute concerning contracts with Video University."
22 (ECF No. 80-1 at 2-3). Determining the intent of the parties to the 1982 Agreement
23 will require assessing Myers' credibility. Consequently, the jury, not the Court, will
24 have to decide on the proper interpretation of the Covenant Not to Sue.

25 Because the undisputed facts do not establish, as a matter of law, that the
26 Covenant Not to Sue bars Leadership from bringing the Trademark Claims, Blanchard
27 Inc. is not entitled to summary judgment on the Trademark Claims.
28

## B. The Release Issue

Leadership contends that, even if the parties intended the Covenant Not to Sue to prevent Leadership from bringing any violation of trademark action against Blanchard Inc. at any time, the Covenant Not to Sue does not prevent Leadership from bringing the Trademark Claims because the Covenant Not to Sue was a general release subject to California Civil Code § 1542 . (ECF No. 116 at 26). Leadership contends that, under California Civil Code § 1542, the Covenant Not to Sue could not waive rights belonging to the owner of the Mark, which Leadership did not acquire until 1985. *Id.* Blanchard Inc. contends that the Covenant Not to Sue was a specific release and therefore § 1542 does not apply. (ECF No. 93 at 12).

Under California law, "a covenant not to sue operates as a release." *Matthey v. Gally*, 4 Cal 62, 64 (1854). California law divides releases into two categories: general releases and specific releases. *See Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1444 (9th Cir. 1986). California Civil Code § 1542 provides that "[a] general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

In *Brae Transp., Inc. v. Coopers & Lybrand*, the Court of Appeals was tasked with deciding whether a release was general and consequently subject to § 1542. 790 F.2d 1439. The plaintiffs in *Brae* purchased stock in a company from the defendants and later discovered that the net worth of the company was less than the defendants had warranted. *Id.* at 1440. The parties settled their dispute by entering into an agreement that released the defendants from all claims concerning the company's net worth. *Id.* The Court of Appeals concluded that the release was specific because it "stemmed from a specific section of the Stock Purchase Agreement . . . [and] general only in the sense that it waived all future (and hence unknown) claims as to the specific issue of net worth." *Id.* at 1444. The Court of Appeals concluded that § 1542 did not apply to the

release. *Id.*

In the 1982 Agreement, Leadership "agree[d] not to pursue violation of trademark action [against Blanchard Inc.] now or in the future as it refers to Situational Leadership." (ECF No. 65-7 at 2). Leadership released certain claims against Blanchard Inc. for violation of the Mark. *See Matthey,* 4 Cal at 64 ("[A] covenant not to sue operates as a release."). Like the release at issue in *Brae*, the Covenant Not to Sue was specific in that it was written to cover claims arising from a specific source of Leadership's rights (the Mark) and "general only in the sense that it waived all future (and hence unknown) claims as to the specific issue." *Brae*, 790 F.2d at 1144. Consequently, § 1542 does not apply to the Covenant Not to Sue. If the parties to the 1982 Agreement intended the Covenant Not to Sue to apply to the Trademark Claims, § 1542 did not prevent them from effectuating their intent.

## C. The Novation Issue

Leadership contends that, even if the parties intended the Covenant Not to Sue to prevent Leadership from bringing any violation of trademark action against Blanchard Inc. at any time, the 1987 Agreement was a novation that superseded and replaced the 1982 Agreement and the Covenant Not to Sue. (ECF No. 116 at 3). Leadership contends that the 1987 Agreement comprehensively addressed the parties' rights to the Mark and is inconsistent with an interpretation of the Covenant Not to Sue under which it would continue to preclude the Trademark Claims. *Id.* Leadership contends that the parties conduct after the 1987 Agreement demonstrates that they intended it to supercede and replace the 1982 Agreement. *Id.*

Blanchard Inc. contends that the 1987 Agreement did not supersede the Covenant Not to Sue because "there is no language in the 1987 Agreement which . . . would revoke or supersede the earlier promise." (ECF No. 65-1 at 23). Blanchard Inc. contends that "there are no obligations in the 1987 Agreement conflicting with the [Covenant Not to Sue]." (ECF No. 93 at 9). Blanchard Inc. contends that it has not

"engaged in any conduct inconsistent with its intent to enforce a right not to be sued for using the Situational Leadership trademark." *Id.* at 14.

A "[n]ovation is the substitution of a new obligation for an existing one." Cal. Civ. Code § 1530. One means of accomplishing a novation is by "the substitution of a new obligation between the same parties, with intent to extinguish the old obligation." *Id.* at § 1531(1). A "[n]ovation is made by contract, and is subject to all the rules concerning contracts in general." *Id.* at § 1532. "Whether a new agreement amounts to a novation is always a question of intention; and intention on the part of all parties that such agreement should constitute a novation must clearly appear." *O'Reilly v. Johnson*, 205 P.2d 716, 717 (Cal. Ct. App. 1949). The party "relying upon a novation must establish that the new obligation was intended as a substitution and extinguishment of the old one." *Anglo-California Tr. Co. v. Wallace*, 209 P.2d 78, 79 (Cal Ct. App. 1922).

A contract is more likely to be a novation when it is inconsistent with the contract it allegedly novates. *See Douillard v. Woodd*, 128 P.2d 6, 8 (Cal. 1922); *Olympic Fin. Co. v. Thyret*, 337 F.2d 62, 68 (9th Cir. 1964) (To determine whether an agreement is a novation, "it is necessary to contrast the respective rights and obligations of the parties before and after the effective date of this instrument."). "Another important factor in determining whether there has been novation . . . is the conduct of the parties." *Fanucchi & Limi Farms v. United Agri Prod.*, 414 F.3d 1075, 1085 (9th Cir. 2005) (interpreting California law).

There is no language in the 1987 Agreement that expressly states that the parties intended to replace the 1982 Agreement. *See* ECF No. 65-7 at 13-17. In support of its contention that the 1987 Agreement "imposes obligations on [Blanchard Inc.] that directly conflict with the [Covenant Not to Sue]," Leadership cites provisions of the 1987 Agreement restricting Blanchard Inc.'s use of the Mark and requiring Blanchard Inc. to gather material for renewal applications. (ECF No. 116 at 18).

However, these additional obligations incurred by Blanchard Inc. do not conflict with Leadership's promise not to bring trademark infringement claims against Blanchard Inc.: Both parties can simultaneously uphold their respective obligations, and Leadership can enforce Blanchard Inc.'s contractual obligations by suing for breach of contract.[4] The Court concludes that there are no provisions of the 1987 Agreement that conflict with the Covenant Not to Sue.

The circumstances that led to the 1987 Agreement support the conclusion that the parties were able to accomplish the primary purpose of the 1987 Agreement without invalidating the Covenant Not to Sue. In its Response to Blanchard's motion, Leadership noted that the 1982 Agreement "had numerous drawbacks" including that "its very existence could weaken the Mark's strength." ECF No. 116 at 17 (citing *Already LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013), for the proposition that "'granting covenants not to sue may be a risky long-term strategy for a trademark holder' because they can be construed as naked licenses."). The 1987 Agreement addressed this "drawback" by requiring Blanchard Inc. to only use the Mark in connection with products that met certain quality thresholds. *Id.* at 17-18. Leadership's contractual obligation not to bring actions against Blanchard Inc. for violating the Mark did not invalidate this requirement or prevent Leadership and Blanchard Inc. from furthering their "mutual interest" in ensuring the strength of the Mark. *Id.* at 18.

The parties conduct after the 1987 Agreement also does not support the conclusion that the parties intended the 1987 Agreement to supersede the Covenant Not to Sue. Leadership contends that the "parties consistently have treated the 1987 [Agreement] as the operative contract governing the parties relationship." (ECF No.

---

[4] Leadership's First Cause of Action is for breach of the 1987 Agreement. (ECF No. 49 at ¶¶ 57-69).

116 at 23). Leadership cites the following facts[5] to support this contention: (1) Blanchard Inc. "repeatedly has acknowledged [an] obligation" imposed on it by the 1987 Agreement, *id.*; and (2) the 1982 Agreement was not mentioned in an internal memorandum written by Dr. Blanchard,[6] Blanchard Inc.'s discovery responses, or Dr. Blanchard's response to a Leadership executive's request for any documents that addressed the parties' relationship, *id.* at 13-14. Blanchard Inc.'s compliance with the 1987 Agreement is not evidence that the 1987 Agreement replaced the 1982 Agreement because compliance with the 1987 Agreement is consistent with the terms of the 1982 Agreement. "The intention on the part of all parties that [the 1987] agreement should constitute a novation" is not "clearly app[arent]" from Dr. Blanchard's response to the Leadership executive, the internal memorandum, or Blanchard Inc.'s discovery responses. *O'Reilly v. Johnson*, 205 P.2d 716, 717 (Cal. Ct. App. 1949).

The Court concludes that the 1987 Agreement did not supersede the Covenant Not to Sue as a matter of law because (1) there is no language in the 1987 Agreement that expressly revokes the Covenant Not to Sue, (2) there are no provision of the 1987 Agreement that conflict with the Covenant Not to Sue, and (3) the conduct of the parties has not been consistent with the continued validity of the Covenant Not to Sue.

### D. The Waiver and Estoppel Issue

Leadership contends that "[w]hether it is considered estoppel or implied waiver," Blanchard Inc. is barred "from using the 1982 Agreement as a defense to [Leadership's] trademark claims" because of its "conduct from 1987 forward," specifically the fact that Dr. Blanchard's response to a Leadership executive's request

---

[5] The Court accepts these facts as true for the purposes of this motion for summary judgment.

[6] Leadership contends that shortly after the 1987 Agreement was executed, Dr. Blanchard wrote an internal Blanchard Inc. memorandum that discussed the implications of the 1987 Agreement and did not refer to the 1982 Agreement. (ECF No. 116 at 13). However, Leadership has provided no support for these assertions. *See* ECF 116-3 at ¶ 42 (citing sources that do not discuss an internal Blanchard Inc. memorandum).

for any documents that addressed the parties' relationship did not mention the 1982 Agreement. (ECF No. 116 at 27). Blanchard Inc. contends that it "is not estopped from seeking dismissal of the Trademark Claims on the basis of the Covenant Not to Sue" and that Leadership's "waiver argument fares no better." (ECF No. 93 at 13).

"The doctrine of equitable estoppel . . . provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment." *Strong v. County of Santa Cruz*, 543 P.2d 264, 266 (Cal. 1975) (In Bank) (citing *City of Long Beach v. Mansell*, 476 P.2d 423, 442 (Cal. 1970) (In Bank)). "[E]stoppel requires reasonable reliance on a misleading communication upon which the victim was intended to rely." *Warner Bros. Int'l Television Distribution v. Golden Channels & Co.*, 522 F.3d 1060, 1069 (9th Cir. 2008).

In order for Blanchard Inc. to be estopped from using the Covenant Not to Sue as a defense to the Trademark Claims, Leadership must have come to believe that the 1982 Agreement was no longer enforceable by "reasonabl[y] rel[ying] on a misleading communication" from Blanchard Inc. *Id.* Leadership bases its claim for equitable estoppel on Dr. Blanchard's response to a request made by a executive for "any documents . . . that addressed the parties' relationship." (ECF No. 79 at 14, 27). Dr. Blanchard's response did not mention the 1982 Agreement. *Id.* However, Leadership was a party to both the 1982 Agreement and the 1987 Agreement, and therefore had constructive knowledge of the rights established under those agreements. The Court concludes that Leadership could not reasonably rely on Dr. Blanchard's response to believe that the 1982 Agreement was no longer enforceable. Blanchard Inc. is not estopped from relying upon the Covenant Not to Sue as a defense to the Trademark Claims. *See Warner Bros.*, 522 F.3d at 1069.

The California Supreme Court recently summarized the requirements for an implied waiver:

> As we have explained in various contexts, waiver means the intentional relinquishment or abandonment of a known right. Waiver requires an existing right, the waiving party's knowledge of that right, and the party's actual intention to relinquish the right. Waiver always rests upon intent. The intention may be express, based on the waiving party's words, or implied, based on conduct that is so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.

*Lynch v. California Coastal Comm'n*, 396 P.3d 1085, 1088 (Cal. 2017) (citations omitted). There is no evidence in the record that suggests that Blanchard Inc. expressly waived its rights under the Covenant Not to Sue. There is no evidence of conduct of Blanchard Inc. "that is so inconsistent with an intent to enforce the [Covenant Not to Sue] as to induce a reasonable belief that [its] right[s] ha[ve] been relinquished." *Id.* Blanchard Inc. has not waived its rights under the Covenant Not to Sue.

### E. Conclusion

The jury must decide whether the Covenant Not to Sue was intended to prevent Leadership from bringing the Trademark Claims or only claims relating to the dispute involving Video University. Consequently, the Court denies Blanchard Inc.'s motion for summary judgment on the Trademark Claims.

If the jury concludes that the Covenant Not to Sue was intended to apply only to claims related to Blanchard Inc.'s interactions with Video University, the Covenant Not to Sue does not prevent Leadership from bringing the Trademark Claims as those claims are not based on Blanchard Inc.'s interactions with Video University. *See* ECF No. 49 at ¶¶ 107-147. If the jury concludes that the Covenant Not to Sue was intended to prevent Blanchard Inc. from bringing any claims for violation of the Mark, Leadership is barred from pursuing the Trademark Claims.[7] The Court concludes that

---

[7] Leadership's Third Cause of Action is for "Trademark Infringement Under the Lanham Act" and alleges that Blanchard Inc.'s "uses of the Mark and several derivative marks infringe on [its] Mark in violation of Section 32(1)(a) of the Lanham Act." *Id.* at ¶¶ 93, 105. Leadership's Fourth Cause of Action is for "Trademark Infringement Via Reverse Confusion Under the Lanham Act" and alleges that "the consumer confusion generated by Blanchard

Covenant Not to Sue has not been rendered unenforceable by California Civil Code § 1542, the 1987 Agreement, or Blanchard Inc.'s conduct.

## V. Leadership's Fifth Cause of Action

Leadership's Fifth Cause of Action for Fraud in Obtaining Registered Marks seeks cancellation of certain trademarks. ECF No. 49 at ¶ 147. Blanchard Inc. contends that this Court does not have subject matter jurisdiction over Leadership's Fifth Cause of Action if Leadership's Trademark Claims are dismissed. (ECF No. 65-1 at 25). Under Section 37 of the Lanham Act, "In any action involving a registered mark the court may . . . order the cancellation of registrations . . . ." 15 U.S.C § 1119. "This language specifies that cancellation may only be sought if there is already an ongoing action that involves a registered mark . . . ." *Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 599 (9th Cir. 2014). Because the Court has not dismissed the Trademark Claims, it continues to have subject matter jurisdiction over Leadership's Fifth Cause of Action.[8]

## VI. Requests for Attorney Fees

Both Leadership and Blanchard Inc. contend that the Court should award them attorney fees. Blanchard Inc. contends that the Court should award it attorney fees because (1) Leadership pursued this case despite its awareness of the 1982 Agreement, and (2) Leadership Studies, Inc. attempted to conceal the fact that it is the same entity as Leadership Studies Productions, Inc., the company that was a party to the 1982 Agreement.[9] (ECF No. 65-1 at 27, 28). Leadership contends that the Court should

---

[Inc.]'s actions have, and continue to, undermine Leadership Studies' ability to use and benefit from the Mark." *Id.* at ¶¶ 111, 121. Both of these causes of action are actions for violation of the Mark.

[8] The Court reserves judgment on whether it would retain subject matter jurisdiction over Leadership's Fifth Cause of Action if the Trademark Claims were dismissed.

[9] Blanchard Inc. also "requests the opportunity to submit additional briefing and evidence that bears on the timing and motivation of Leadership['s lawsuit] . . . ." (ECF No. 65-1 at 28). Blanchard Inc. may raise this issue in a motion for sanctions if it so desires.

award it attorney fees because Blanchard Inc. "was well-aware of the facts that show that the 1987 License superseded the 1982 Covenant (or . . . establish[] material factual disputes in that area)." (ECF No. 116 at 31).

Section 35 of the Lanham Act provides that "[t]he Court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). A case is "exceptional" when it "stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014) (interpreting the Patent Act). "[I]n determining whether to award fees . . . district courts c[an] consider a 'nonexclusive' list of 'factors,' including 'frivolousness, motivation, objective unreasonableness . . . and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* at 1756 n.4 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)). "District courts analyzing a request for fees under the Lanham Act should examine the 'totality of the circumstances' to determine if the case was exceptional, exercising equitable discretion in light of the nonexclusive factors identified in *Octane Fitness* and *Fogerty* . . . ." *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1181 (9th Cir. 2016) (quoting *Octane Fitness*, 134 S. Ct. at 1756).

Neither party is entitled to attorney fees based on "the substantive strength of [the other] party's litigating position." *Octane Fitness*, 134 S. Ct. at 1756. The scope of the Covenant Not to Sue and the effects of the 1987 Agreement are legal issues appropriately brought before this Court. The parties' arguments in support of their respective positions on these issues are neither "frivolous[]" nor "objective[ly] unreasonable[]." *Octane Fitness*, 134 S. Ct. at 1756 n.4 (quoting *Fogerty*, 510 U.S. at 534 n.19).

Blanchard Inc. is also not entitled to attorney fees based on Leadership's alleged attempts to conceal the fact that Leadership Studies, Inc. is the same entity as

Leadership Studies Productions, Inc. Leadership Studies Productions, Inc. changed its name to "Leadership Studies" during the negotiations that culminated in the 1987 Agreement, and that name change was reflected in the different drafts of that Agreement. Blanchard Inc. can be presumed to have been aware of the relationship between the parties with whom they were negotiating, and consequently is not entitled to attorney fees for Leadership's alleged efforts to conceal that relationship.

**VII. Conclusion**

IT IS HEREBY ORDERED that Blanchard Inc.'s Motion to Dismiss and, in the Alternative, Motion for Summary Judgment (ECF No. 65) is DENIED.

**DATED**: 11/29/17

**WILLIAM Q. HAYES**
United States District Judge