


FILED

16 APR 27 AM 7:52

[illegible stamp]

BY: [illegible]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEADERSHIP STUDIES, INC., a California corporation, | Case No.: 15cv1831-WQH(KSC) |
| | **REPORT AND RECOMMENDA-TION RE JOINT MOTION FOR** |
| Plaintiff, | **DETERMINATION OF DISCOVERY** |
| v. | **DISPUTE SEEKING EXCLUSION** |
| BLANCHARD TRAINING AND DEVELOPMENT, INC., | **OF EXPERT TESTIMONY** |
| Defendant. | **[Doc. No. 141]** |
| AND RELATED COUNTERCLAIMS. | |

Before the Court is the parties' Joint Motion for Determination of Discovery Dispute. [Doc. No. 141.] In the Joint Motion, plaintiff seeks discovery sanctions against defendant under Federal Rule of Civil Procedure 37(c)(1), claiming that defendant failed to timely disclose one of its expert witnesses, Hal Poret ("Mr. Poret"), pursuant to the Third Amended Scheduling Order [Doc. No. 100] and the expert disclosure requirements in Federal Rule of Civil Procedure 26(a). Defendant disclosed Mr. Poret as a rebuttal

1

expert and then served plaintiff with Mr. Poret's rebuttal report. However, plaintiff believes Mr. Poret's report "is not a proper rebuttal report" and should therefore be excluded as untimely. [Doc. No. 141, at p. 5.] Plaintiff believes defendant should have designated Mr. Poret as an initial expert rather than as a rebuttal expert and should have disclosed Mr. Poret's report on the deadline for exchanging initial expert reports rather than on the deadline for exchanging expert rebuttal reports. As a result, plaintiff claims it was surprised and is now disadvantaged because it is unable to effectively respond to Mr. Poret's expert rebuttal report. Plaintiff therefore seeks an order excluding Mr. Poret's expert report and expert testimony. [Doc. No. 141, at pp. 2-17.] Both parties also seek an award of monetary sanctions against each other for the costs associated with preparing the Joint Motion.[1] [Doc. No. 141, at pp. 2, 28.] For the reasons outlined more fully below, IT IS RECOMMENDED that the District Court DENY plaintiff's request for an order imposing discovery sanctions against defendant under Rule 37(c)(1). The Court also finds that the parties' requests for monetary sanctions must be DENIED.

### *Background*

The operative Third Amended Complaint was filed on November 7, 2016 and includes nine causes of action. Only two of these causes of action are relevant to the parties' Joint Motion. These are the third cause of action for trademark infringement in

---

[1]     The parties also disagree as to whether the Joint Motion is timely and expend a great deal of paper discussing this issue. Under the applicable Scheduling Orders, "[a]ll discovery motions must be filed within 45 days of the service of an objection, answer, or response which become the subject of dispute, or the passage of a discovery due date without response or production. . . ." [Doc. No. 59, at p. 2; Doc. No. 100, at pp. 1, 4; Doc. No. 137, at p. 2.] Chamber Rule V(A) further states that "discovery motions shall be filed no later than 45 days after the event giving rise to the dispute." The Court considers the parties' discovery motion to be timely, because the dispute arose on December 17, 2017, when defendant served Mr. Poret's rebuttal report, and the parties' Joint Motion was filed less than 45 days later on January 16, 2018.

1 | violation of the Lanham Act and the fourth cause of action for trademark infringement
2 | via reverse confusion under the Lanham Act. [Doc. No. 49, at pp. 1, 11-38.] Plaintiff
3 | claims ownership of a "valid trademark registration" for the mark "Situational
4 | Leadership®." [Doc. No. 49, at pp. 5, 17.][2]

Plaintiff Leadership Studies, Inc., doing business as Center for Leadership Studies ("CLS"), represents in the Third Amended Complaint that it "is engaged in the business of teaching and promoting the 'Situational Leadership Model,' which enables managers, salespeople, peer leaders, teachers, and parents to interface with and influence others more effectively. [Plaintiff] conducts workshops and certification processes with its customers, who use its unique curriculum to guide the customers onto the path of becoming more effective leaders." [Doc. No. 49, at p. 2.] Defendant is essentially involved in the same type of business. [Doc. No. 49, at p. 2.]

Plaintiff's founder, Paul Hersey ("Dr. Hersey"), developed the "Situational Leadership Model" methodology while working with Ken Blanchard ("Dr. Blanchard"), and the two became partners in CLS. [Doc. No. 49, at p. 4.] Dr. Blanchard later sold his interest in CLS, released his rights to any of CLS's copyrighted materials, and assigned his interest in a pending trademark application for the mark "Situational Leadership" to CLS. [Doc. No. 49, at p. 4.]

Next, Dr. Blanchard decided to open his own company, apparently known as Blanchard Training and Development, Inc., the defendant in this action. [Doc. No. 49, at pp. 2, 5.] Defendant entered into a License Agreement with plaintiff in 1987 to use the trademark "Situational Leadership." [Doc. No. 49, at p. 4.] According to the Third Amended Complaint, the License Agreement only permitted the use of the Situational

---

[2]    The subject trademark is referenced by the parties in different ways, such as Situational Leadership, Situational Leadership®, and SITUATIONAL LEADERSHIP. For the sake of simplicity and consistency, the Court will generally refer to the subject trademark as Situational Leadership unless context requires otherwise.

Leadership trademark "in association with goods and services which [met] and [exceeded] a level of quality exemplified by the goods and services presently offered under the mark 'Situational Leadership.'" [Doc. No. 49, at p. 4.] Under the License Agreement, defendant was also obligated to cooperate with plaintiff in maintaining the viability of the trademark and was required to use the "appropriate statutory notice symbol" (*i.e.*, Situational Leadership®). [Doc. No. 49, at p. 5.] "Defendant has been using the mark 'Situation Leadership II' in the United States and internationally since some time after the execution of the License Agreement." [Doc. No. 49, at p. 17.] However, plaintiff alleges that defendant "has dropped the ® in much of its use of the derivative mark 'Situational Leadership II.'" [Doc. No. 49, at p. 17.]

In 2006, plaintiff learned that defendant "registered the mark 'Situational Leadership II' in English in China." [Doc. No. 49, at p. 6.] To avoid litigation, plaintiff and defendant entered into an agreement allowing defendant to use the "Situational Leadership" mark in English in China. [Doc. No. 49, at p. 7.] However, defendant then "commenced a pattern and practice of registering the marks 'Situational Leadership' and 'Situational Leadership II' in other countries" in violation of the License Agreement [Doc. No. 49, at p. 7.] As a result of defendant's actions, plaintiff has been denied the ability to register the mark in these other countries. [Doc. No. 49, at p. 7.]

Plaintiff also claims that defendant began marketing its product as "Situational Leadership® II – the SLII Experience" and then applied to register "SLII" as a trademark. [Doc. No. 49, at p. 8.] The acronym "SLII" did not "trigger any potential conflicting marks with the Patent and Trademark Office or other notice to [plaintiff] that [defendant] claimed ownership of this derivative mark." [Doc. No. 49, at p. 8.] In addition, plaintiff claims that defendant did not disclose the existence of a senior mark (*i.e.*, Situational Leadership®) in its trademark application even though "SLII" is shorthand for "Situational Leadership® II." [Doc. No. 49, at p. 8.] According to the Third Amended Complaint, defendant's position is that its use of "Situational Leadership II" falls outside of and is not governed by the License Agreement. [Doc. No. 49, at p. 9.]

4

In the third cause of action for trademark infringement, plaintiff specifically alleges that defendant's use of the above-referenced marks is "likely to cause confusion, or to cause mistake, or to deceive the public as a result of the overall similarity of the marks in sound, appearance and meaning." [Doc. No. 49, at p. 18.] As a result, plaintiff claims the public may mistakenly believe that defendant's competitive training seminars and materials "are related to, and authorized by" plaintiff. [Doc. No. 49, at p. 19.] Plaintiff also believes that defendant is "engaged in efforts to create a secondary meaning in 'SLII' by associating it with the registered Mark" and that defendant also "intends that such secondary meaning shall inure to the benefit of [defendant] and not [plaintiff]." [Doc. No. 49, at p. 19.]

In the fourth cause of action for trademark infringement via reverse confusion, plaintiff alleges that defendant, through its infringing acts, seeks to undermine plaintiff's "goodwill and reputation," and to intentionally confuse consumers with false statements indicating that defendant is "the senior or even sole owner" of the intellectual property that is related to the "Situational Leadership" mark. [Doc. No. 49, at p. 20.] For example, plaintiff alleges that at least one customer was informed by defendant's representative that plaintiff is a licensee of the "Situational Leadership®" mark. [Doc. No. 149, at p. 22.] In addition, plaintiff alleges that defendant has engaged in "active disparagement" of plaintiff's products and services. [Doc. No. 149, at p. 22.]

In its Answer to the Third Amended Complaint, defendant generally denies plaintiff allegations of trademark infringement, confusion, and/or reverse confusion and claims that it has at all relevant times "made clear that the terms SLII and "Situational Leadership II" identify [defendant's] differentiated version of Situational Leadership." [Doc. No. 52, at pp. 16-19.] Affirmative defenses alleged in defendant's Answer included laches, estoppel by acquiescence, estoppel by naked licensing, statute of limitations, waiver, and unclean hands. [Doc. No. 52, at pp. 27-42.] In addition, defendant filed a Counterclaim for cancellation of the mark "Situational Leadership." [Doc. No. 52, at p. 42.] In the Counterclaim, defendant contends that plaintiff "has failed

to prevent or control the widespread uncontrolled use of the Situational Leadership mark by third parties," resulting in its use "in a generic manner." [Doc. No. 52, at p. 50,] The Counterclaim also alleges that any registrations of Situational Leadership as a mark are "vulnerable to cancellation on the basis that they have been abandoned, among other bases." [Doc. No. 52, at p. 53.]

## ***Discussion***

### *I.* ***Plaintiff's Request for Discovery Sanctions.***

In the Joint Motion, plaintiff alleges that defendant's disclosure of Mr. Poret's expert rebuttal report did not satisfy the expert disclosure requirements set forth in Federal Rule 26(a) or the terms of the Third Amended Scheduling Order. As a result, plaintiff seeks discovery sanctions against defendant under Federal Rule 37(c)(1). As noted above, plaintiff claims that sanctions are warranted, because Mr. Poret's expert rebuttal report includes improper rebuttal in that it addresses whether the Situational Leadership trademark is or has become generic. Since defendant has the burden of proof on this issue, plaintiff contends that defendant should have disclosed Mr. Poret as an initial expert rather than as a rebuttal expert, and that Mr. Poret's report should have been disclosed earlier, on November 9, 2017, when the parties exchanged their initial expert reports, rather than on December 1, 2017, when rebuttal reports were scheduled to be exchanged.

As a result of defendant's alleged "violation" of the rules and the Third Amended Scheduling Order, plaintiff claims it has been disadvantaged. Mr. Poret's expert report includes "the sole survey report," and because this "sole survey report" was not revealed until the time for the exchange of supplemental or rebuttal reports, plaintiff argues it is unable to "rebut" the content of the survey. [Doc. No. 141, at p. 13 n. 9.] Plaintiff claims that defendant deliberately withheld the survey for tactical reasons and that it was unfairly "surprise[d]" when the survey was disclosed in Mr. Poret's rebuttal expert report. [Doc. No. 141, at p. 16.] If defendant had disclosed the survey earlier, plaintiff claims it "would have considered responsive measures." [Doc. No. 141, at p. 16.] According to

plaintiff, "[t]he damage has been done, and there is no way around it." [Doc. No. 141, at p. 16.] In plaintiff's view, defendant's alleged "violation" could not be cured by allowing plaintiff an opportunity to rebut Mr. Poret's report as this would be "a false remedy" that would reward defendant "for its violation and encourag[e] the same gamesmanship in the future." [Doc. No. 141, at p. 17.]

In opposing plaintiff's request for an order excluding expert testimony by Mr. Poret, defendant acknowledges that it has the burden of proving its assertion that the subject trademark is or has become generic, and, as a result, it was required to disclose an affirmative expert report on this issue. Defendant believes it fulfilled this obligation when it timely disclosed its initial expert report by Dr. David Yerkes, because Dr. Yerkes' expert report addresses this issue. [Doc. No. 141, at pp. 17-18.]

Defendant also contends that it properly designated Mr. Poret as a rebuttal expert. Defendant intends to use Mr. Poret's testimony to rebut and contradict the opinions of plaintiff's experts (*i.e.*, Dr. Butters, Ms. Harper, and Mr. Hochman) who expressed opinions that Situational Leadership is not a generic term. [Doc. No. 141, at p. 17.] In addition, it is defendant's belief that plaintiff's request for discovery sanctions is essentially an attempt to "bury" Mr. Poret's expert rebuttal report and survey because it is convincing evidence of defendant's position that the subject trademark is or has become generic. [Doc. No. 141, at p. 20.] As support for this argument, defendant cites plaintiff's curious withdrawal of its own survey expert, Dr. Stec, in an apparent attempt to negate the need for Mr. Poret's survey. [Doc. No. 141, at pp. 19-20.]

### A. *Federal Rule of Civil Procedure 37(c)(1).*

Rule 37(c)(1) states as follows: "If a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence . . . at trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1). The party facing sanctions has the burden of establishing that its failure to make appropriate disclosures under Rule 26(a) was

7

substantially justified and/or harmless. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

**B. *Expert Disclosure Requirements Under the Federal Rules.***

Under Federal Rule of Civil Procedure 26(a)(2)(A), "a party must disclose to the other parties the identity of any witness it may use at trial to present [expert testimony]." Fed.R.Civ.P. 26(a)(2)(A). An expert disclosure "must be accompanied by a written report—prepared and signed by the witness . . . . The report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or date considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case." Fed.R.Civ.P. 26(a)(2)(B).

"A party must make these disclosures at the times and in the sequence that the court orders. . . ." Fed.R.Civ.P. 26(a)(2)(D). Rule 26(a)(2)(D) further states in general terms that the parties must exchange export reports that include the information listed in Rule 26(a)(2)(B) and that rebuttal expert reports should be exchanged at a later time. Fed.R.Civ.P. 26(a)(2)(D)(i)&(ii). Expert reports are exchanged "sufficiently in advance of trial" so that "opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." Fed.R.Civ.P. 26 advisory committee's note (1993 amendments).

**C. *Expert Disclosure Requirements in the Third Amended Scheduling Order.***

Under the Court's Third Amended Scheduling Order, the parties were required to designate their respective experts in writing by September 25, 2017. On October 9, 2017, the parties were required to designate any rebuttal experts. Thereafter, the parties were directed in the Third Amended Scheduling Order to exchange initial expert reports on or before November 9, 2017. On or before December 1, 2017, the parties were directed to

supplement their expert disclosures "regarding contradictory or rebuttal evidence under Rule 26(a)(2)(D)." [Doc. No. 100, at p. 2.] The Third Amended Scheduling Order further states that: "The written designations shall include the name, address and telephone number of the expert and ***a reasonable summary of the testimony the expert is expected to provide.*** . . ." [Doc. No. 100, at p. 2 (emphasis added).]

### D. *Events Leading to the Parties' Joint Motion.*

Both parties designated experts and rebuttal experts and exchanged both initial expert and rebuttal expert reports according to the dates set forth in the Third Amended Scheduling Order. On September 25, 2017, plaintiff designated six experts, including Dr. Ronald R. Butters, Rhonda Harper, Jonathan E. Hochman, and Dr. Jeffrey A. Stec. [Doc. No. 141-13, at pp. 1-7.] The following is a summary of the relevant information plaintiff disclosed as to each of these experts on September 25, 2017:

> **Dr. Butters**, a specialist in the area of linguistics, was expected to testify "as to why, based on basic linguistic principles, the trademarks at issue . . . are sufficiently similar to create a linguistic confusion of the ordinary speaker of English." [Doc. No. 141-13, at p. 4.] In addition, Dr. Butters was expected to testify "as to the meaning of the respective trademarks as perceived by the ordinary English-speaking consumer" and why plaintiff's trademark "functions as an indicator of the source of products or services."[3] [Doc. No. 141-13, at p. 4.]

> **Ms. Harper**, a specialist in the area of licensing, marketing, branding, consumer perception, and business management, was expected to testify as to why plaintiff's trademark "functions as an indicator of the source of products or services" and "why the trademarks at issue . . . are sufficiently similar to cause a consumer to be confused regarding the source of products or services. . . ." [Doc. No. 141-13, at pp. 5-6.]

---

[3] In the Joint Motion, plaintiff indicates that its use of the ambiguous topic "why plaintiff's trademark 'functions as an indicator of the source of products or services'" is essentially another way of stating its theory that the subject trademark is not generic. [Doc. No. 141, at p. 4.]

**Mr. Hochman**, who has "expertise and experience in entrepreneurship, technology, marketing, internet search marketing, search engine optimization, software development, business development, business operations, sales and related fields," was expected to provide testimony on various topics involving search engine marketing. [Doc. No. 141-13, at pp. 6-7.]

**Dr. Stec**, is a specialist in the area of economic, financial, statistical, and survey research, and in the collection and analysis of data. Dr. Stec was expected "to testify regarding his survey research conducted in connection with the present litigation, as well as the methods of survey research." [Doc. No. 141-13, at p. 8.] In addition, Dr. Stec was "expected to testify about why the findings of his survey research demonstrate that (i) plaintiff's trademark functions as an indicator of the source of products and services, and (ii) the trademarks at issue . . . are sufficiently similar to cause a consumer to be confused regarding the source of products or services." [Doc. No. 141-13, at pp. 7-8.]

On September 25, 2017, defendant served plaintiff with its designation of Dr. David Yerkes as an initial expert. [Doc. No. 141-4, at pp. 1-5.] To support its contention that defendant should have also disclosed Mr. Poret as an initial expert on September 25, 2017, plaintiff cites documentary evidence indicating that Mr. Poret and Dr. Yerkes were retained by defendant as experts at or around the same time and/or that Mr. Poret may have been retained before Dr. Yerkes.[4] [Doc. No. 141, at p. 3, citing Doc. No. 141-3, at pp. 2-3; Doc. No. 141-11, at pp. 2-3.]

According to defendant's initial expert designation notice, Dr. Yerkes is a professor of English and Comparative Literature, and he "was expected to provide an opinion that the term 'situational leadership' is or has become a generic term in the

---

[4]    Both experts signed a form entitled "Agreement to be Bound by Protective Order" agreeing to maintain the confidentiality of certain documents produced in this case. [Doc. No. 141-3, at pp. 2-3; Doc. No. 141-11, at pp. 2-3.] Mr. Poret signed the form on September 6, 2017. [Doc. No. 141-11, at p. 3.] Dr. Yerkes signed the form on September 21, 2017. [Doc. No. 141-3, at p. 3.]

10

context of goods and services." [Doc. No. 141-4, at p. 4.] The designation notice further states as follows: "David Yerkes is expected to provide an opinion that the relevant public primarily understands 'situational leadership' as describing 'what' the associated goods and services are. David Yerkes is expected to provide an opinion that the relevant public would not primarily understand the mark as describing 'who' the particular good or service is, or where it comes from. In sum, David Yerkes is expected to provide an opinion that the primary significance of the term in the minds of the consuming public is now the product and not the producer." [Doc. No. 141-4, at p. 4.]

On October 1, 2017, shortly after the parties designated their initial experts on September 25, 2017, defense counsel sent plaintiff's counsel a letter stating that plaintiff's designations did not comply with the Third Amended Scheduling Order. Specifically, this letter states that defendant "is prejudiced in assessing and identifying potential expert rebuttal witnesses," because plaintiff did not comply with the provision of the Third Amended Scheduling Order requiring the parties to provide "a reasonable summary of the testimony the expert is expected to provide." [Doc. No. 141-14, at p. 2, quoting Doc. No. 100, at p. 2.] According to defendant, plaintiff only provided "a list of anticipated topics." [Doc. No. 141-14, at p. 2; Doc. No. 141-16, at pp. 2-3.] Plaintiff responded that its rebuttal designations were sufficient. [Doc. No. 141-15, at p. 1.]

On October 9, 2017, as part of its notice pertaining to the designation of its rebuttal experts, defendant once again claimed "prejudice" because plaintiff's initial expert designations provided only "vague and overlapping topics" and did not disclose a summary of each expert's expected testimony as required by the Third Amended Scheduling Order. [Doc. No. 141-12, at p. 3.] Despite this objection, defendant designated Mr. Poret as a rebuttal expert, indicating that he "designs, supervises, and analyzes consumer surveys" in trademark matters; reviews other surveys; and "consults regarding survey design." [Doc. No. 141-12, at p. 5.] The designation further states that: "Mr. Poret is expected to provide testimony in rebuttal to Dr. Stec regarding the topics associated with Dr. Stec in [plaintiff's initial expert] designations. *However, in view of*

*his broad experience in trademark, advertising, damages, and consumer perception matters, he may also provide testimony in rebuttal to Blum, Butters, Harper, and Hochman*." [Doc. No. 141-12, at p. 5 (emphasis added).] Defendant also designated Dr. Yerkes as a rebuttal expert "to provide testimony in rebuttal to Dr. Butters" . . . [as to] why 'Situational Leadership' functions as an indicator of the source of products or services. . . ." [Doc. No. 141-12, at p. 7.]

In the Joint Motion, plaintiff complains that it was unfairly surprised by the content of Mr. Poret's expert rebuttal report, because defendant's designation of Mr. Poret was "vague" and did not specify that Mr. Poret "would rebut Butters, Harper, or Hochman on the issue of genericness." [Doc. No. 141, at pp. 3-4.] Defendant contends that any ambiguity in the designation of Mr. Poret stemmed from the ambiguities in plaintiff's initial expert designations. As noted above, defendant argues that plaintiff's designation of opening experts "contained only vague, duplicative, and indefinite topics," which left defendant with "no choice but to offer a similarly broad disclosure identifying Poret as a rebuttal expert to Stec, as well as potentially to Butters, Harper, and Hochman." [Doc. No. 141-, at pp. 19-20.] The Court agrees with defendant. Since plaintiff's initial expert designations only included a broad, general list of topics to be addressed by its initial experts and did not include "a reasonable summary of the testimony the expert is expected to provide" as required by the Third Amended Scheduling Order [Doc. No. 100, at p. 2], defendant was disadvantaged in designating its rebuttal experts. As this Court reads it, defendant's designation of Mr. Poret clearly indicates that he could be expected to provide rebuttal testimony on ***any*** topic addressed by plaintiff's initial experts, "Blum, Butters, Harper, and Hochman," so plaintiff cannot claim it was surprised by the content of Mr. Poret's expert rebuttal report. [Doc. No. 141, at p. 4.] Given the ambiguities in plaintiff's initial expert designations, defendant's description of Mr. Poret's role as a rebuttal expert was adequate under the circumstances.

On November 9, 2017, the deadline for exchanging initial expert reports, plaintiff withdrew its designation of Dr. Stec as an expert. [Doc. No. 141, at p. 4.] However, the

record before the Court indicates that plaintiff did serve defendant with initial expert reports by Dr. Butters and Ms. Harper, as copies of these reports were submitted to the Court for consideration in connection with the instant Joint Motion.[5] [Doc. Nos. 141-6 and 141-7 (Pl.'s Exhibit Nos. 5 and 6), submitted under seal at Doc. Nos. 143-2 and 143-3.] On December 1, 2017, the deadline for exchanging supplemental or rebuttal expert reports, defendant served plaintiff with the disputed rebuttal expert report prepared by Mr. Poret. [Doc. No. 141, at pp. 4-5.]

### E. *Burdens of Proof in Trademark Infringement Cases.*

Generally, a plaintiff alleging trademark infringement has the burden of establishing ownership of a valid and/or registered trademark; infringement of that trademark by the defendant; and damages caused by the infringement. Ninth Circuit Manual of Model Jury Instructions (Civil) §§ 15.0, 15.5 (West 2007). A registration certificate creates a rebuttable presumption of validity that the owner may rely on to establish the right to exclude others from using the trademark. Ninth Circuit Manual of Model Jury Instructions (Civil) § 15.7. "Validity, then, is a threshold issue. On this point, the plaintiff in an infringement action with a registered mark is given the *prima facie* or presumptive advantage on the issue of validity, thus shifting the burden of production to the defendant to prove otherwise. . . . [In other words,] the defendant then bears the burden with respect to invalidity. Once the presumption of validity is overcome, however, the mark's registration is merely evidence 'of registration,' nothing more. This approach can be characterized as rebutting the prima facie case or 'piercing the presumption.'" *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002).

---

[5] The parties' exhibits also include a copy of an expert report by Mr. Hochman. [Doc. No. 143-8, at pp. 1-156.] However, the Court did not review Mr. Hochman's lengthy expert report, as it is apparent that the content of his report would not change the Court's analysis or the outcome of the parties' Joint Motion.

To satisfy the infringement element, the plaintiff must show that the defendant used the trademark or a similar mark in commerce and that the defendant's use of the mark "is likely to cause confusion . . . as to the source of the goods." Ninth Circuit Manual of Model Jury Instructions (Civil) § 15.5. The plaintiff must establish likelihood of confusion "even when relying on an incontestable registration"). *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004). "To determine whether a likelihood of consumer confusion exists, [the Ninth Circuit applies an] eight-factor . . . test, which reviews: (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016). "The factors are non-exhaustive and applied flexibly. . . . A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances." *Id.* (internal citations and quotations omitted). *See also* Ninth Circuit Manual of Model Jury Instructions (Civil) § 15.16.

"Trademark law provides great protection to distinctive or strong trademarks. Conversely, trademarks not as distinctive or strong are called 'weak' trademarks and receive less protection from infringing uses. Trademarks that are not distinctive are not entitled to any trademark protection." Ninth Circuit Manual of Model Jury Instructions (Civil) § 15.17. To determine strength, trademarks are classified "along a spectrum of five categories ranging from strongest to weakest: arbitrary, fanciful, suggestive, descriptive, and generic. [Citation omitted.] Arbitrary and fanciful marks, which employ words and phrases with no commonly understood connection to the product, are the two strongest categories, and 'trigger the highest degree of trademark protection.' [Citation omitted.] In the middle of the spectrum are suggestive marks, which suggest a

product's features and require consumers to exercise some imagination to associate the suggestive mark with the product. [Citations omitted.] Descriptive and generic marks, at the other end of the spectrum, are the two weakest categories. Descriptive marks define a particular characteristic of the product in a way that does not require any imagination, while generic marks describe the product in its entirety and are not entitled to trademark protection. [Citation omitted.]" *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016).

"Generic marks are not capable of receiving protection because they identify the product, rather than the product's source." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005), citing *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005). "A descriptive term, unlike a generic term, can be a subject for trademark protection under appropriate circumstances. Although descriptive terms generally do not enjoy trademark protection, a descriptive term can be protected provided that it has acquired 'secondary meaning' in the minds of consumers, *i.e.*, it has 'become distinctive of the [trademark] applicant's goods in commerce.'" *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999), quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10 (2d Cir. 1976) and 15 U.S.C. § 1052(f). "Steak & Brew, for example, is descriptive of a restaurant's fare, but was held to have acquired secondary meaning, and is therefore entitled to trademark protection, because customers associate the mark with a particular restaurant chain." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993), citing *Longchamps, Inc. v. Eig*, 315 F.Supp. 456, 458 (S.D.N.Y. 1970).

"[C]ourts often have difficulty in distinguishing between generic and descriptive terms." *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1015 (9th Cir. 1979). To determine whether a descriptive mark has secondary meaning, a finder of fact considers: "(1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner

15

of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive." *Yellow Cab*, 419 F.3d at 930.

Generally, the burden of proof for a defendant in a trademark infringement action is to establish that the trademark is invalid, has been abandoned, or that some other affirmative defense applies. Ninth Circuit Manual of Model Jury Instructions (Civil) §§ 15.0, 15.20 *et seq*. However, as noted above, "[t]he presumption of validity applies generally against any challenge that the mark is invalid, including an allegation that the mark is generic." *In re Cordua Restaurants, Inc.*, 823 F.3d 594, 600 (Fed. Cir. 2016), citing *Coca–Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254 (9th Cir.1982). *See also Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d at 928. On the other hand, "the plaintiff retains the ultimate burden of persuasion in a trademark infringement action, namely proof of infringement. A necessary concomitant to proving infringement is, of course, having a valid trademark; there can be no infringement of an invalid mark." *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002).

A registered mark that was once distinctive may become generic over time and subject to cancellation. *Yellow Cab*, 419 F.3d at 928. "To determine whether a term has become generic, we look to whether consumers understand the word to refer only to a particular producer's goods or whether the consumer understands the word to refer to the goods themselves. If buyers understand the term as being identified with a particular producer's goods or services, it is not generic. But if the word is identified with all such goods or services, regardless of their suppliers, it is generic." *Id.* at 929 (internal citations and quotations omitted). A simple, "who-are-you/what-are-you" test is typically applied to determine whether a term is generic. "A mark answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?' But the generic name of the product answers the question 'What are you?'" *Id.* at 929. In the *Filipino Yellow Pages* case, for example, the Ninth Circuit concluded that "'Filipino yellow pages' answered the 'what are you?' question, and was thus a generic term." *Filipino Yellow Pages*, 198 F.3d

at 1151. If asked "what are you?" the Ninth Circuit concluded that the competing
companies in the case "could all answer 'a Filipino yellow pages.'" *Id.*

### E. *Initial Expert Reports vs. Rebuttal Expert Reports.*

"[I]n most cases the party with the burden of proof on an issue should disclose its expert testimony on that issue before other parties are required to make their disclosures with respect to that issue." Fed.R.Civ.P. 26 advisory committee's note (1993 amendments). Thus, "[a] party presents its arguments as to the issues for which it has the burden of proof in its initial expert report." *Nordock Inc. v. Sys. Inc.*, 927 F. Supp. 2d 577, 584 (E.D. Wis. 2013).

"A rebuttal expert report presents expert opinions refuting the arguments made by the opposing party in its initial expert report." *Nordock Inc. v. Sys. Inc.*, 927 F. Supp. 2d at 584. Under Federal Rule 26(a)(2)(D)(ii), the scope of a rebuttal expert report is limited. As defined in Rule 26(a)(2)(D)(ii), an expert report qualifies as a rebuttal report if it "is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)." Fed.R.Civ.P. 26(a)(2)(D)(ii). "[E]xpert reports that simply address the same general subject matter as a previously-submitted report, but do not directly contradict or rebut the actual contents of that prior report, do not qualify as proper rebuttal or reply reports." *Withrow v. Spears*, 967 F. Supp. 2d 982, 1002 (D. Del. 2013).

A rebuttal report may not be used to advance "new arguments" that are outside the scope of the opposing expert's report. *Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 17 (D.D.C. 2013). In other words, a rebuttal expert report is not to be used as an opportunity for a "do-over" of an initial expert report. *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004). However, "[a] rebuttal expert may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert." *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co.*, 290 F.R.D. 11, 16 (D. Mass. 2013). In other

15cv1831-WQH(KSC)

words, there is no bright line rule requiring automatic exclusion of a rebuttal report that contains information that could have been included in an initial expert report.

In *Crowley v. Chait*, 322 F.Supp.2d 530 (D.N.J. 2004), for example, a report by one of defendant's experts criticized an assessment prepared by plaintiff's expert for not applying the standards used during the time period in question. In a rebuttal report, the plaintiff's expert responded that the standards applied were in fact used at the time in question. As further proof of this position, the expert attached a supporting transcript from a professional symposium to the rebuttal report. *Id.* at 551. The defendant objected to the attachment of the transcript to the rebuttal report, because the plaintiff's expert had possession of it before the initial assessment was prepared and could have disclosed it earlier with the initial assessment. The District Court concluded that the defendant's view of "what is permissible on rebuttal" was too narrow. *Id.* If this narrow approach was applied, the District Court said it "would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material. All that is required is for the information to repel other expert testimony. . . ." *Id.*

A rebuttal expert may also introduce new methods of analysis in a rebuttal report as long as the new method is offered to contradict or rebut an opposing party's expert. *Deseret Management Corp. v. U.S.*, 97 Fed. Cl. 272 (Fed. Cl. Ct. 2011). In *Deseret*, for example, an initial report prepared by the plaintiff's expert employed a "residual method" to estimate the value of the license at issue. The defendant then disclosed a rebuttal expert report that applied a "discounted cash flow method" to determine the value of the license. *Id.* at 273. The plaintiff then argued that the defendant's expert report was not a proper rebuttal report, because it employed a "new, alternative theory." *Id.* The Federal Court of Claims disagreed, finding that both reports addressed the same subject matter (*i.e.*, the value of the license), but the defendant's expert report applied the "discounted cash flow method" to contradict the plaintiff's expert report. As a result, the analysis in

1   the defendant's expert report "unmistakably serve[d] to rebut" that of the plaintiff's

2   expert and was therefore proper rebuttal. *Id.* at 274.

3       In sum, to determine whether a party's expert report is composed of legitimate

4   rebuttal in compliance with Rule 26(a)(2)(A)&(D)(ii), this Court must look to the

5   relevant expert reports and consider: (1) whether the rebuttal expert report addresses the

6   same subject matter as the initial report it purportedly rebuts; and (2) whether the rebuttal

7   expert report "is intended solely to contradict or rebut evidence" in the opponent's initial

8   expert report. Fed.R.Civ.P. 26(a)(2)(A)&(D)(ii).

9               **G.    *Use of Survey Evidence in Trademark Infringement Cases.***

10      Plaintiff argues in the Joint Motion that Mr. Poret's expert opinion and testimony

11  "are essential for [defendant] to prove genericness," so defendant was required to

12  designate him as an initial expert and disclose his opinion and survey evidence on the

13  deadline for exchanging initial expert reports. [Doc. No. 141, at p. 10.] This is simply

14  not true. Although survey evidence has become more common in trademark

15  infringement litigation, "that does not mean that it is needed, required or introduced in the

16  majority of cases." 6 McCarthy on Trademarks and Unfair Competition § 32:195 (5[th]

17  ed.). One reason that "accurate and scientifically precise surveys" are not always offered

18  into evidence in trademark infringement cases "is that they are costly." 6 McCarthy on

19  Trademarks and Unfair Competition § 32:196 (5th ed.).

20      Surveys can be used for a number of different reasons in trademark cases. For

21  example, surveys can be used "to help prove the existence of secondary meaning." *Id.* at

22  §32:190. In *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609 (9th Cir. 1989), the Ninth

23  Circuit considered whether the plaintiff's trade dress had acquired "secondary meaning,"

24  and commented that: "An expert survey of purchasers can provide the most persuasive

25  evidence of secondary meaning." *Id.* at 615. However, the Ninth Circuit also

26  commented that the probative value of the particular survey at issue was "reduced,"

27  because the survey population was "rather limited." *Id.* Later, in *Committee for Idaho's*

28  *High Desert v. Yost*, 92 F.3d 814 (9th Cir. 1996), the Ninth Circuit noted that survey

evidence "is ***only one*** of the most persuasive ways to prove secondary meaning, and ***not a requirement for such proof***." *Id.* at 822 (emphasis added). The Ninth Circuit concluded that "secondary meaning" was established based on testimony by members of the target user group, evidence of "significant" advertising of the plaintiff's name and business activities, and evidence of intentional and deliberate copying by the defendant. *Id. See also Tools USA and Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654 (4th Cir. 1996) (noting that "surveys are not required to prove likelihood of confusion" and finding that a jury's finding of likelihood of confusion was "amply supported" by the testimony of individual customers and employees about numerous incidents of "actual customer confusion").

A survey can also be used "to resolve a genericness challenge." 2 McCarthy on Trademarks and Unfair Competition § 12:16 (5th ed.). "The most widely used" format for this purpose is a "*Teflon* Survey." *Id.* "The name comes from a 1973 telephone survey used as evidence by a court to determine that TEFLON was a valid trademark, not a generic name for non-stick coating." *Id.* Survey participants were given a list of eight names and asked to distinguish between brand names, such as "a word like Chevrolet" and common names, such as "a word like automobile" that is made by a number of different companies. *Id.* A majority of participants identified TEFLON as a brand name as compared to other names, such as margarine and refrigerator. *Id.* "A number of courts have admitted into evidence the results of a *Teflon*-type survey." *Id. Teflon* surveys have also been used "as evidence that a designation has acquired a secondary meaning as a trademark" and as evidence "that a designation is suggestive and not directly descriptive of a product." *Id.*

"The usual procedure is for one of the parties to the litigation to hire a survey taker to run an appropriate survey. The survey expert for the opponent may then attack the substance and form of the other side's survey and/or counter it with a different survey producing different results. Then ensues the 'battle of the experts,' a process that takes

place in many trial of all kinds." 6 McCarthy on Trademarks and Unfair Competition § 32:158 (5th ed.).

## H.  *The Relevant Expert Reports.*

Preliminarily, the Court rejects plaintiff's suggestion that defendant should have designated both Dr. Yerkes and Mr. Poret as initial experts, because documentary evidence suggests defendant retained them at or around the same time and because both of their reports address genericness and defendant has the burden of proof on this issue. Based on the authorities discussed above, it is this Court's view that defendant could have but was not required to present survey evidence in an initial expert report to support its contention that the subject trademark is or has become generic. Because of the relative burdens of proof in trademark cases and the allegations in the parties' pleadings, it is apparent that genericness is one of the key issues in the case and that both parties had an interest in exchanging initial expert reports addressing this issue. Defendant's theory is that the subject trademark is generic. Plaintiff's theory, of course, is that the subject trademark is not generic, and this issue is related to issues that plaintiff apparently plans to address in its case-in-chief, such as the validity and strength of the mark and how the mark is perceived by the relevant set of consumers or potential consumers.

As outlined above, survey evidence is only one way to show that a trademark is or has become generic or to show that a trademark is not generic. In this regard, defendant retained Dr. Yerkes, a highly experienced professor of English and Comparative Literature, "to address the status of the term 'situational leadership' in the English language" and in light of the standard set forth by the Ninth Circuit's recent decision in *Elliott v. Google*, 860 F.3d 1151 (9th Cir. 2017). [Doc. No. 143-4, at p. 7 (Exhibit 8).] More specifically, the analysis completed by Dr. Yerkes' in his initial expert report considers the term "situational leadership" in light of the Ninth Circuit's rule that "a trademark only becomes generic when the 'primary significance of the registered mark to the relevant public' is the name for a particular type of good or service irrespective of its source." [Doc. No. 143-4, at 8, 35, citing and quoting *Elliott v. Google*, 860 F.3d at

1156.] Citing deposition testimony, Dr. Yerkes notes that the relevant public broadly includes "'the entire spectrum' of 'organizations,'" as well as those with specialized knowledge or interest in leadership studies. [Doc. No. 143-4, at p. 9.] In his view, dictionary evidence, including entries in specialized dictionaries that define the terms "situational leadership" or "situational leadership theory" indicate that the relevant public primarily understands "situational leadership" as a generic term. [Doc. No. 143-4, at pp. 9-12.] As further support for his position, Dr. Yerkes cites independent research from electronic searches which he believes are confirmation that "situational leadership" is being used as a generic term under the definition set forth by the Ninth Circuit in *Elliott v. Google*, 860 F.3d at 1156. [Doc. No. 143-4, at pp. 12-21.] In sum, based on his review of deposition testimony about the scope of the relevant public, definitions included in general dictionaries, specialized dictionaries, and independent research from electronic searches, Dr. Yerkes concluded in his report that "situational leadership" is a generic term for a particular type of goods or services irrespective of the source of those goods or services. [Doc. No. 143-4, at p. 8.]

In this Court's view, the initial expert report prepared by Dr. Yerkes and disclosed to plaintiff on or about November 9, 2017 was sufficient to satisfy defendant's initial expert disclosure obligations under Federal Rule 26(a)(2)(D) and the Third Amended Scheduling Order, and defendant was not required to disclose Mr. Poret as an initial expert simply because he was retained by defendant at or about the same time as Dr. Yerkes. When viewed at the time the parties were scheduled to designate initial experts, it appears, without more, that the need for defendant to incur the expense of completing and producing survey evidence was, at best, uncertain. It is possible that defendant would not have incurred the expensive of a survey if plaintiff did not designate a survey expert in its initial disclosures. Without more, it is further apparent that the need for survey evidence only became compelling after plaintiff designated its initial experts and produced its initial expert reports. Since Mr. Poret's report directly rebuts the opinions of Dr. Butters and Ms. Harper on the same subject matter, it also does not

1 appear to be significant for purposes of defendant's disclosure obligations that defendant

2 withdrew its designation of Dr. Stec as a survey expert.

3 Based on a review of the expert reports submitted by the parties with their Joint

4 Motion, it is this Court's view that: (1) the reports prepared by both Dr. Butters and

5 Ms. Harper include opinions on the same subject matter as the report prepared by

6 Mr. Poret (*i.e.*, whether the trademark Situational Leadership is or has become generic);

7 and (2) Mr. Poret's rebuttal expert report "is intended solely to contradict or rebut

8 evidence on the same subject matter" in the expert reports prepared for plaintiff by

9 Dr. Butters and Ms. Harper. Fed.R.Civ.P. 26(a)(2)(D)(ii).

10 Among other issues, the expert reports by Dr. Butters and Ms. Harper directly

11 address the issue of genericness. Dr. Butters' report indicates that he is a highly

12 experienced linguistics professor. [Doc. No. 143-2, at 3 (Exhibit 5).] His report

13 addresses two main issues: (1) the likelihood of linguistic confusion between the

14 registered trademark Situational Leadership and Situational Leadership II and/or SLII;

15 and (2) the extent to which Situational Leadership is generally understood by

16 contemporary American English speakers and specifically "within the community of

17 actual and potential purchasers" as the name and unique source of plaintiff's products and

18 services and of the quality of those products and services. In other words, whether

19 Situational Leadership answers the question "who we are" or whether it is a "mere

20 description" of "what" it is concerned with (*i.e.*, a leadership training programs). [Doc.

21 No. 143-2, at pp. 4-8.] The discussion of the first issue (*i.e.*, likelihood of confusion) is

22 completed in about four pages. [Doc. No. 143-2, at pp. 8-12.] The major portion of the

23 report (*i.e.*, about 42 pages) focuses on the second issue, which includes an in-depth

24 analysis of whether Situational Leadership is or has become a generic term. [Doc. No.

25 143-2, at pp. 12-53.]

26 As this Court reads it, the main purpose of the discussion of the second issue in

27 Dr. Butters' report is to convince the reader that: (1) Situational Leadership is strongly

28 associated with the products and services sold by both plaintiff and defendant;

(2) Situational Leadership is not merely a descriptive term for a type of leadership or leadership training program; and (3) Situational Leadership has never been and has not become generic. [Doc. No. 143-2, at pp. 12-53.] In his lengthy discussion as to whether Situational Leadership could be characterized as generic, Dr. Butters references and addresses specific evidence that plaintiff expects defendant to rely on to support its theory that Situational Leadership is or has become generic. [Doc. No. 143-2, at pp. 40-53.]

Dr. Butters' report states that: "Over the decades, Situational Leadership has come to be associated among consumers and potential consumers with educational materials and courses of instruction based on the scholarly research of the scholar who originated the term and the theoretical concepts for understanding effective leadership methodology." [Doc. No. 143-2, at p. 12.] Generally summarized, Dr. Butters' opinion is that Situational Leadership "is not a 'generic' term when applied to educational services, namely, conducting seminars and workshops, nor to the materials used to support those endeavors. What Situational Leadership is is a management training program. Who Situational Leadership is is the unique source of the goods and services and of the quality of the goods and services so named." [Doc. No. 143-2, at p. 15.]

As supporting evidence for his opinions, Dr. Butters cites evidence from the leadership training industry, such as a training industry website. The website is similar to a catalog and has tabs for various categories, such as "Content Development," and "Sales Training." [Do. No. 143-2, at p. 15.] Clicking on the tab labeled "Leadership Training," takes the user to a page listing "2017 Top Leadership Training Companies." [Doc. No. 143-2, at p. 15.] One of the tabs on this page is labeled as follows: "The Center for Leadership Studies, The Global Home of Situational Leadership." [Doc. No. 143-2, at p. 16.] Other evidence cited by Dr. Butters includes an excerpt from a training industry magazine, results obtained through a research tool called The Corpus of Contemporary American English (COCA), dictionaries, and internet search engines. [Doc. No. 143-2, at pp. 19-40.]

Ms. Harper's report states that she is a consultant who has a master's degree in business administration and a background in many areas of business, including brand marketing, consumer and market research, advertising and promotion, merchandizing, licensing, and corporate strategy. [Doc. No. 143-3, at p. 5 (Exhibit 6).] Although her *curriculum vitae* lists surveys as one of her areas of specialization, Ms. Harper was not asked to provide survey evidence in this case on plaintiff's behalf.[6] [Doc. No. 143-3, at pp. 11-12, 52.] She was asked to provide an expert opinion as to several topics, including: (1) whether and why Situational Leadership functions as an indicator of the source of the products or services, and quality thereof (*i.e.*, whether Situational Leadership is or has become generic); and (2) whether and why Situational Leadership, Situational Leadership II, and SLII are sufficiently similar to cause a consumer to be confused as to the source of the products or services and quality thereof. [Doc. No. 143-3, at p. 11.]

In Ms. Harper's opinion, Situational Leadership® is not only a trademark but a brand name. [Doc. No. 143-3, at p. 15.] Through the efforts of its founders and others, Ms. Harper believes that Situational Leadership has become a "'household' branded name in corporate circles among past, current, and potential buyers/consumers." [Doc. No. 143-3, at p. 16.] The major focus of her expert report seems to be that there are a number of reasons from a brand and/or marketing perspective that consumers are likely to be confused as to the source of products and services. For example, Ms. Harper explains that the name Situational Leadership® II, as used by defendant, implies that it is an improvement or updated version originating from the same source rather than from two separate sources (*i.e.*, plaintiff and defendant). As support for this theory,

---

[6]    In a Declaration submitted with the parties' Joint Motion, defense counsel represents that Mr. Harper testified in her deposition that "she generally refers to the *Teflon* standard when she consults with clients on genericness, though she did not perform a *Teflon* survey in this case." [Doc. No. 141-20, at p. 3.]

Ms. Harper cites examples, such as Sony's PlayStation, PlayStation 2, and PlayStation 3. [Doc. No. 143-3, at pp. 17-18.]

Ms. Harper's report clearly expresses the opinion that Situational Leadership is not generic as defendant contends. [Doc. No. 143-3, at pp. 21, 35.] For example, she states that: "As a Mark, Model, and Brand, Situational Leadership® is not generic as defendant counterclaims." [Doc. No. 143-3, at p. 21.] In support of this statement, Ms. Harper cites deposition testimony by defendant's vice president of marketing "that potential buyers immediately connected Situational Leadership® to [defendant] [albeit incorrectly]." [Doc. No. 143-3, at p. 21.] In addition, as noted above, Ms. Harper's opinion is that Situational Leadership has become a "'household' branded name in corporate circles among past, current, and potential buyers/consumers." [Doc. No. 143-3, at p. 16.]

Mr. Poret's report states that he has a bachelor's degree in mathematics, a master's degree in mathematics, and a law degree. He has experience in designing, supervising, and analyzing consumer surveys. [Doc. No. 143-1, at p. 42.] His report acknowledges that Dr. Butters, Ms. Harper, and Mr. Hochman all prepared expert reports opining that the term Situational Leadership is not generic in the context in which plaintiff uses it. [Doc. No. 143-1, at p. 4.] He also notes that Mr. Hochman "appears to suggest that Situational Leadership is a brand and not a generic term in the context of internet searches for the relevant type of services." [Doc. No. 143-1, at p. 4.] Next, Mr. Poret states that he was retained "to design and conduct a survey to empirically test from a consumer perception standpoint the validity of [plaintiff's] experts' position that Situational Leadership is not a generic term." [Doc. No. 143-1, at p. 3.]

Mr. Poret designed and conducted a survey "among actual and prospective consumers of the relevant type of services – namely, representatives of organizations who are personally involved in retaining or hiring a company to provide management/leadership training and development programs, courses, workshops, or seminars." [Doc. No. 143-1, at p. 4.] "The purpose of the survey was to empirically test whether the relevant universe of consumers perceives Situational Leadership to be a

brand term or a generic term." [Doc. No. 143-1, at p. 5.] According to Mr. Poret, "the survey showed that Situational Leadership is overwhelmingly perceived by relevant consumers to be a generic term across representatives of various positions (associate, director, manager, or executive level), various departments (human resources, learning/education, management, sales, etc.) and various company sizes from 50 employees to more than 500 employees." [Doc. No. 143-1, at p. 5.] To design his survey and prepare his report, Mr. Poret reviewed a number of case materials and the expert reports written by Dr. Butters, Ms. Harper, and Mr. Hochman. [Doc. No. 143-1, at p. 5.] "The survey employed the well-accepted *Teflon* format for assessing whether a term is generic." [Doc. No. 143-1, at p. 8.] In part, Mr. Poret referred to plaintiff's description of its prospective customer base in the Complaint to obtain a sampling of responses from the "proper universe" of "prospective and actual consumers." [Doc. No. 143-1, at p. 19.]

Similar to the rebuttal report at issue in *Deseret v. U.S.*, 97 Fed. Cl. at 273-274, Mr. Poret's rebuttal report uses a different, new method of analysis to rebut the opinions expressed by Dr. Butters and Mr. Harper that the subject trademark is not generic because it functions as an indicator of the source of certain products or services. Although the reports prepared by Dr. Butters and Ms. Harper apply linguistic methods and cite various research tools to analyze how Situational Leadership is perceived by actual or potential consumers, their reports do not cite any direct evidence from specific individuals who would qualify as actual or potential consumers. Mr. Poret's report directly rebuts and contradicts the opinions of Dr. Butters and Ms. Harper based on "a survey 'among actual and prospective consumers of the relevant type of services. . . .'" [Doc. No. 143-1, at p. 4 *et seq.*] Under these circumstances, this Court cannot conclude that Mr. Poret's report is not proper rebuttal.

Even if plaintiff could establish that defendant should have disclosed Mr. Poret as an initial expert rather than as a rebuttal expert, the Court would not make a finding that discovery sanctions were warranted for failure to satisfy the expert disclosure requirements in the Federal Rules or the Third Amended Scheduling Order. Given that

15cv1831-WQH(KSC)

survey evidence is costly and not required in trademark cases, it appears reasonable that defendant did not initially designate Mr. Poret to present survey evidence until plaintiff disclosed Dr. Stec as one of its initial experts. [Doc. No. 141-13, at pp. 7-8.] As noted above, plaintiff's designation of Dr. Stec stated in part that he was "expected to testify about why the findings of his survey research demonstrate" that the subject trademark is not generic (*i.e.*, why plaintiff's trademark "functions as an indicator of the source of products or services"). [Doc. No. 141-13, at pp. 7-8; Doc. No. 141, at p. 4.] Even though plaintiff chose to withdrew Dr. Stec as an expert, it is this Court's view that defendant was substantially justified in designating Mr. Poret as a survey expert in response to the designation of Dr. Stec. [Doc. No. 141-13, at pp. 7-8.] Given the content of the expert reports prepared by Dr. Butters and Ms. Harper, defendant is also substantially justified in designating Mr. Poret to provide testimony to rebut their methods and conclusions with data from a survey of individuals who qualify as actual or potential consumers. [Doc. No. 143-2; Doc. No. 143-3.]

Based on the foregoing, this Court declines to make a finding that defendant failed to satisfy the expert disclosure requirements set forth in the Federal Rules and the Third Amended Scheduling Order, or that Mr. Poret's expert report contains improper rebuttal. For the same reasons, the Court rejects plaintiff's conclusory argument that it was "irreversibly" harmed when defendant disclosed the survey evidence in Mr. Poret's expert report and would have taken other measure if Mr. Poret's rebuttal expert report had been disclosed at an earlier time. [Doc. No. 141, at pp. 16-17.] Plaintiff had time under the Third Amended Scheduling Order to depose Mr. Poret and/or to prepare for effective cross-examination and has not requested additional time to do so based on a showing of good cause.

## II.   *The Parties' Requests for Monetary Sanctions Against Each Other.*

Plaintiff and defendant both seek monetary sanctions against each other for the costs and fees associated with preparing their Joint Motion. [Doc. No. 141, at pp. 17-18,

15cv1831-WQH(KSC)

28.] Under the circumstances presented, the Court finds that an award of monetary sanctions would be unjust.

### *Conclusion*

Based on the foregoing, the Court finds that defendant did not violate the expert disclosure requirements set forth in Federal Rule 26(a)(2) or the Third Amended Scheduling Order. The Court also finds that Mr. Poret's expert report is not untimely and does not constitute improper rebuttal. Accordingly, IT IS HEREBY RECOMMENDED that the District Court DENY plaintiff's request for an order imposing discovery sanctions against defendant under Federal Rule 37(c)(1) by excluding Mr. Poret's expert report and expert testimony. [Doc. No. 141.] Of course, this finding is without prejudice to the filing of a motion *in limine* by either party requesting the exclusion of expert testimony at trial for other reasons. *See, e.g., City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1046 (9th Cir. 2014); Piper Aircraft Corp. v. Wag-Aero, Inc.,* 741 F2d 925, 930-932 (7th Cir. 1984).

For the reasons outlined above, IT IS HEREBY ORDERED that the parties' requests for monetary sanctions to cover the costs and fees associated with preparing the Joint Motion are DENIED. [Doc. No. 141.]

This Report and Recommendation is submitted to the assigned United States District Judge pursuant to Title 28, United States Code, Section 636(b), and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appear of this Court order. *Martinez v. Ylst,* 951 F.2d 1153, 1156 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: April 26 , 2018

Hon. Karen S. Crawford
United States Magistrate Judge

15cv1831-WQH(KSC)